251 F.2d 171
 Theresa E. SCHWEITZER, Administratrix of the Estate of William A. Schweitzer, Jr., Plaintiff-Appellant,
v.
Hazel M. GILMORE and George M. Gilmore, doing business as Oakwood Camp, Defendants-Appellees.
 No. 64.
 Docket 24692.
 United States Court of Appeals Second Circuit.
 Argued November 19, 1957.
 Decided January 20, 1958.
 
 Cole & Cole, Hartford, Conn., Bertrand Quinto, Morton E. Cole, Donald R. Hirsch, Hartford, Conn. (Cyril Cole of counsel on the brief), for plaintiff-appellant.
 John E. McNerney and Francis J. Moran, New Haven, Conn., for defendants-appellees.
 Before HAND, HINCKS and LUMBARD, Circuit Judges.
 LUMBARD, Circuit Judge.
 
 
 1
 The questions for decision are whether the judge should have charged the jury with respect to res ipsa loquitur and last clear chance in view of the evidence regarding Schweitzer's drowning when he attempted to swim ashore after the defendants' raft drifted from its anchorage. We hold that such instructions were not required and affirm the judgment for the defendants.
 
 
 2
 Plaintiff brought this suit in the District of Connecticut to recover damages for the wrongful death of her husband, William A. Schweitzer, who drowned while swimming in Lake Pocotopaug, Connecticut on August 11, 1953. A guest at defendants' resort, he had swum out to the raft provided by the defendants for their guests and others. The raft at the time was anchored approximately 100 feet out from the beach; bathers could walk out to within 20 to 35 feet of the raft and then had to swim the rest of the distance.
 
 
 3
 The defendants' summer resort or camp, which could accommodate up to 60 or 70 guests, was located across the road from the beach. The defendants, with the help of neighbors, set out the raft each spring. The raft, which had been anchored in approximately the same location for fifteen or sixteen years, had broken loose only once before during a severe storm. Although the defendants advertised the bathing facilities in connection with the camp, the raft was freely used by both their guests and others swimming in that part of the lake and no effort was made to supervise the bathing. It was undisputed that the swimming area was without life-saving equipment, floatlines, or lifeguard. The defendants had a number of rowboats for rent, some of which may have been on shore at the time of the accident, but no lifeboat was maintained.
 
 
 4
 When Schweitzer swam out to the raft, two boys, David Solger and James Dickinson, were already out there, alternately swimming in the vicinity of the raft and sunning themselves. Schweitzer climbed up on the raft and stretched out in the warm August afternoon sun. About 40 to 75 people, mostly children, were on the beach or swimming in the shallow water near shore. Various boats dotted the lake, although only one was near the raft when the drowning occurred.
 
 
 5
 Sometime after Schweitzer climbed on the raft, David Solger noticed that the raft appeared to be drifting out from shore. After hesitating a few minutes the boys told Schweitzer that the raft was drifting and then started swimming for shore. Schweitzer "looked frightened." The raft by this time was approximately 150 feet or more from shore. When the boys had swum about halfway in, they heard Schweitzer enter the water. Although Schweitzer was known as a good swimmer, he floundered on the surface for a few minutes and, after calling out, went down about 30 feet from the drifting raft.
 
 
 6
 In the meantime several people on shore had realized Schweitzer's predicament and had attracted the attention of two youths in a rowboat about 125 feet from the place where Schweitzer was struggling in the water. The two youths immediately headed for the drowning man, but in his haste the rower pulled an oar out of the oarlock and the boat pivoted. In two or three minutes they reached the place where Schweitzer had been struggling, but by this time he had disappeared. Attempts to rescue him failed and his body was not recovered until several hours later.
 
 
 7
 At the trial plaintiff attempted to show negligence by offering evidence of the lack of safety equipment and supervision at the beach and negligence in the construction and mooring of the raft. Testimony by the plaintiff's expert tended to show that the safety facilities were less than those generally prevailing at other resorts and that the mooring was insufficient to hold the raft in place. The charge, recognizing that the Gilmores had a duty of due care toward their business guest, expressly left to the jury whether or not the defendants were negligent in failing to take greater "safety precautions such as lifeguards, lifeboats or life rings * * *" and in failing "to use reasonable care in the manner provided for anchoring the raft, and to make the raft reasonably safe for use by Schweitzer," and whether, if it were found that defendants were negligent, such negligence was the proximate cause of the drowning. The Court further charged that if the jury should find Schweitzer had been negligent, they should find for defendants.
 
 
 8
 On the facts of this case the judge's charge adequately and correctly stated the questions to be decided by the jury. This was all that the plaintiff could ask and, as the jury answered these questions favorably to the defendants, the judgment for the defendants must be affirmed.
 
 
 9
 Plaintiff contends that the refusal to charge on res ipsa loquitur doctrine was error. We disagree. Res ipsa loquitur, in Connecticut at least, means nothing more than that the occurrence of an accident in itself is sufficient circumstantial evidence of negligence to permit a jury to find liability without further proof of how the accident occurred. See Ryan v. George L. Lilley Co., 1936, 121 Conn. 26, 183 A. 2. If the court is persuaded that common experience indicates that it is more probable than not that an injury would not have occurred but for the negligence of the defendant, the jury may reasonably infer from the fact of injury that the defendant was negligent.
 
 
 10
 In the instant case, defendants' negligence cannot be reasonably inferred solely from the fact that Schweitzer drowned. Nor did the plaintiff rely solely on the drifting of the raft to establish defendants' negligence. The plaintiff went on to show in detail the construction and anchoring of the raft, the nature of the holding ground, and the adequacy of the manner in which the raft was secured. The Court charged that the jury could take into consideration the facts brought out and the reasonable inferences to be drawn from them in deciding whether the defendants were negligent in anchoring the raft. If the jury found that the anchoring was proper, it would be the sheerest conjecture for them to infer from the fact that the raft drifted that it was due to some negligent act of the defendants. See Cristini v. Griffin Hospital, 1948, 134 Conn. 282, 57 A.2d 262; Ryan v. George L. Lilley Co., supra; Ruerat v. Stevens, 1931, 113 Conn. 333, 155 A. 219.
 
 
 11
 Plaintiff also contends that the Court should have charged the jury that if they found the decedent to be negligent they might find defendants liable on the ground that they had the last clear chance to avoid the accident. The evidence did not require such a charge under Connecticut law. The application of the last clear chance doctrine in Connecticut requires a showing that the injured party was in a position of peril, that the defendant knew or ought to have known of that fact and the fact that the injured party could not or would not escape from the position of danger, that the defendant then had an opportunity to avert the accident, and that he failed to act. Fine v. Connecticut Co., 1918, 92 Conn. 626, 103 A. 901.
 
 
 12
 A consistent thread running through the Connecticut cases, however, is that the doctrine requires a "supervening" or "intervening" negligence, see Nehring v. Connecticut Co., 1912, 86 Conn. 109, 84 A. 301, 524, 45 L.R.A.,N.S., 896, 902; Wilson v. Dunbar, 1935, 120 Conn. 255, 180 A. 296. In effect, if the plaintiff is in a position of peril and the defendant then fails to take steps which could avoid the accident, the defendant's negligence is considered to be the proximate cause of the harm. "It is from that moment (that the plaintiff is in a position of peril) that the inquiry involved in the application of the so-called last clear chance doctrine begins. It is not concerned with earlier happenings or conditions, but only those then existing or subsequently arising, and it is upon them, and them alone, that the determination of the question is dependent." Bujnak v. Connecticut Co., 1920, 94 Conn. 468, 472, 109 A. 244, 245. Because of this emphasis on viewing the opportunities of the defendant after the plaintiff has come into peril, the Connecticut cases uniformly bar recovery if the defendant's inattention caused him to fail to realize that an inattentive plaintiff, although not yet in danger, was approaching a position of peril. See Middletown Trust Co. v. Armour & Co., 1937, 122 Conn. 615, 191 A. 532; Bujnak v. Connecticut Co., supra.
 
 
 13
 Applying this rationale to the circumstances of Schweitzer's drowning, there is nothing in the record to support the view that the defendants, once Schweitzer started struggling in the water, could have avoided the accident. It was too late to seek a lifeguard or to provide lifesaving equipment. The stage had been set when Schweitzer began his ill-fated attempt to swim to shore, and the defendants, whether previously negligent or not, were then powerless to avert the tragedy. Assuming that Schweitzer was negligent, there was no evidence of any intervening negligence within the meaning of the Connecticut doctrine which would relieve the plaintiff of the consequences of Schweitzer's carelessness.
 
 
 14
 Plaintiff argues that the failure to provide proper safety facilities requires a charge on the last clear chance doctrine and relies on Cullen v. Strong, 1930, 110 Conn. 593, 149 A. 201. That case involved another drowning on Lake Pocotopaug where would-be rescuers were delayed by the insistence of defendant's employee that they pay for a boat and then were given a boat with a defective oarlock. Since in these circumstances a jury could reasonably infer that the defendant negligently lost an opportunity to effect the rescue, the decision in that case to reverse and remand for reconsideration, inter alia, of liability on the basis of the last clear chance doctrine is consistent with the views we express.
 
 
 15
 Only one other point need be mentioned. Plaintiff's expert testified to prevailing safety facilities at other resorts considerably more elaborate than those at defendants'. Plaintiff objected to the introduction of evidence by defendants that a neighboring resort had facilities comparable to those at the Gilmore camp. We do not agree with plaintiff's contention that the admission of this evidence was erroneous. In the charge, the Court expressly stated that this evidence could not be used to establish a standard of due care and was restricted in effect to contradicting plaintiff's expert. Admission for this purpose was proper. The expert's opinion was based upon his observation of the facilities at other resorts. The District Court did not abuse its discretion by permitting extrinsic evidence which drew into question the grounds upon which the opinion was based. See 3 Wigmore, Evidence, § 992 (3d Ed. 1940).
 
 
 16
 Affirmed.