Martha M. KIRK, an adult, and Kenneth William Kirk, a minor, who sues by his Guardian Ad Litem, Martha M. Kirk, Appellants,

v.

UNITED STATES of America, Appellee.

No. 16307.

United States Court of Appeals Ninth Circuit.

Aug. 25, 1959.

Richards, Haga & Eberle, Boise, Idaho, for appellants.

1. D.C., 124 F.Supp. 233.

2. Section 2402, Title 28 U.S.C.A.

Ben Peterson, U. S. Atty., Kenneth G. Bergquist, Asst. U. S. Atty., Boise, Idaho, for appellee.

Before POPE, BONE and JERT-BERG, Circuit Judges.

JERTBERG, Circuit Judge.

The appellants are the widow and minor child of William A. Kirk, who lost his life when he fell from a scaffold upon which he was working as a carpenter during the construction of the Lucky Peak Dam on the Boise River in Idaho.

This is the second appearance of this case in this Court. Following the filing of the original complaint and before the filing of answer, the defendant moved the district court for summary judgment in its favor. The motion was granted and summary judgment entered. Following the memorandum decision [1] of the district court, plaintiffs sought leave to file an amended complaint, which motion was denied. On appeal, this Court reversed the judgment and remanded the cause to the district court "with directions to permit the requested amendment of the complaint, and to require the defendant to answer thereto, and to proceed with the trial of the cause upon the merits." 9 Cir., 232 F.2d 763, 770. In that opinion this Court, in substance, held that the plaintiffs' action under the wrongful death statute of the State of Idaho against the United States for negligence, as authorized under the provisions of the Federal Tort Claims Act, Title 28 U.S. C.A. Sections 2674 to 2680, is not barred by the Idaho Workmen's Compensation Act, I.C. § 72–101 et seq., but may be brought in the same manner as any injured employee may bring an action against a third party who is not an employer within the definitions of said workmen's compensation act. Following remand, the cause was tried on the merits before the district court sitting without a jury, as required by statute.[2] Jurisdiction of the district court was based on Section 1346(b), Title 28 U.S.C.A.[3] Sec-

3. "§ 1346(b) * * * the district courts * * * shall have exclusive jurisdiction of civil actions on claims against the

tion 2674, Title 28, provides: "The United States shall be liable * * * in the same manner and to the same extent as a private individual under like circumstances, but shall not be liable for interest prior to judgment or for punitive damages.

"If, however, in any case wherein death was caused, the law of the place where the act or omission complained of occurred provides, or has been construed to provide, for damages only punitive in nature, the United States shall be liable for actual or compensatory damages, measured by the pecuniary injuries resulting from such death to the persons respectively, for whose benefit the action was brought, in lieu thereof."

The action was predicated upon the wrongful death statute of the State of Idaho.[4]

Lucky Peak Dam and the control works thereof were upon land in the possession of and owned by the United States. The control works at the outlet of the dam were being constructed in accordance with plans and specifications prepared by the Department of the Army, Corps of Engineers, under a contract between the United States and Bruce Construction Co. and Russ Mitchell, Inc., independent contractors. Kirk was employed by the contractors as a carpenter, and was not an employee of the United States.

The area where Kirk worked consisted of the top of the control works tower as it was formed of concrete and raised above the river. The concrete was poured inside of forms which were connected to the tower by she-bolts. These bolts tied into the previously poured section below and to the steel reinforcing iron in the area where the new concrete was to be poured. On the back of the form were two scaffold walkways, one above the other, and each protected by guard rails on the outer side. These forms and attached scaffolds could be moved from one pouring area to the next individually or in groups fastened together with three-quarter inch bolts. The forms were strongly constructed and it was the usual practice to move as a unit several forms bolted to each other. Each form had two "eyes" on its top corners to which lines from a crane could be inserted when the form was to be lifted and moved to another pouring location.

On the date of the accident Kirk was working on two panels of forms which were tied into the concrete and reinforcing steel by she-bolts. These forms were twenty and five feet wide respectively, and were 70 or 80 feet high directly over the river. Approximately five days before the accident some of the she-bolts and all of the three-quarter inch bolts holding the two forms together had been removed on orders of the foreman of the contractors.

On the day of the accident lines were run from a crane and attached to "eyes" at the top of the outer side of the two forms for the purpose of lifting both forms as a unit. After other employees of the contractors had removed the she-bolts on which they were working, they stepped off of the form. Kirk was still engaged in removing the last she-bolt. At the time, or immediately after, the

United States, for money damages, accruing on or after January 1, 1945, for injury or loss of property, or personal injury or death caused by the negligence or wrongful act or omission of any employee of the Government where acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law in the place where the act or omission occurred."

4. Section 5–311, Idaho Code. "When the death of a person, not being a minor, is caused by the wrongful act or neglect of another, his heirs or personal representatives may maintain an action for damages against the person causing the death; or if such person be employed by another person who is responsible for his conduct, then also against such other person. In every action under this and the preceding section, such damages may be given as under all the circumstances of the case may be just."

last she-bolt was removed by Kirk the structure collapsed at the point where the two panels were joined, plunging Kirk into the river. He was carried by the current into a tunnel under the dam, through which most of the water of the river was being diverted during construction. His body was recovered some time later. The position of Kirk immediately prior to the accident was variously described by witnesses as the upstream end of the 20-foot section, the downstream end, and toward the middle to the two sections.

After falling into the river Kirk was seen floating on the water. One witness testified as to hearing him call out. Another witness testified, however, that Kirk "paddled unconscious like" for a few seconds.

Following Kirk's death, the plaintiffs duly filed a claim against the United States, which claim was rejected. Subsequently plaintiffs recovered the "death award" under the provisions of the Workmen's Compensation Act of Idaho.

The contract under which the control works at the outlet of the dam was being constructed is typical of contracts used by the Corps of Engineers in the construction of flood control and related projects. It consists of 16 printed pages, together with detailed specifications, schedules, drawings and conditions. The employers of Kirk were required to furnish the materials and perform the work for completion of the dam "in strict accordance with specifications, schedules, drawings and conditions * * *" Under the contract all material and workmanship is subject to inspection, examination and test by representatives of the contracting officer at any and all times during manufacture and/or construction, and the United States retains the right to reject defective material and workmanship or require its correction.

Article 30 of the contract provides:

"Accident Prevention.—(a) In order to provide safety controls for protection to the life and health of employees and other persons; for prevention of damage to property, materials, supplies and equipment; and for avoidance of work interruptions in the performance of this contract; the Contractor will comply with all pertinent provisions of the manual 'Safety Requirements' approved by the Chief of Engineers, 16 December 1941, as revised 16 April 1951, and as may be further amended, and will also take or cause to be taken such additional measures as the Contracting Officer may determine to be reasonably necessary for the purpose.

"(b) The Contractor will maintain an accurate record of, and will report to the Contracting Officer in the manner and on the forms prescribed by the Contracting Officer, exposure data and all accidents resulting in death, traumatic injury, occupational disease, and/or damage to property, materials, supplies and equipment incident to work performed under this contract.

"(c) The Contracting Officer will notify the Contractor of any noncompliance with the foregoing provisions and the action to be taken. The Contractor shall, after receipt of such notice, immediately correct the conditions. Such notice, when delivered to the Contractor or his representative at the site of the work, shall be deemed sufficient for the purpose. If the Contractor fails or refuses to comply promptly, the Contracting Officer may issue an order stopping all or part of the work until satisfactory corrective action has been taken. No part of the time lost due to any such stop order shall be made the subject of claim for extension of time or for excess costs or damages by the contractor.

"(d) Compliance with the provisions of this article by subcontractors will be the responsibility of the Contractor."

The manual "Safety Requirements" mentioned in Article 30 of the contract

was received into evidence. The fore-word of the manual states:

"Purpose

"Accidents on work under jurisdiction of the Corps of Engineers have proven these important conclusions.

"a. Accidents produce consequences which do not operate for the best interests of the Nation.

"b. Circumstances which cause accidents do not automatically adjust themselves with the passing of time; therefore a controlling medium is required.

"These Safety Requirements are designed to assure acceptable standards of safety with a resultant profit to all. They have been developed specifically as considerations to be incorporated into planning, layout, and methods and not as rules to be superimposed thereon.

"Scope

"Pertinent provisions of these Safety Requirements will be applied to all work under jurisdiction of the Corps of Engineers, both military and civil and whether accomplished by contractor or government forces. The term 'pertinent provisions' as used in the foregoing will be those provisions which are applicable to the situation at hand.

"In circumstances where literal application of a requirement to a specific job has impractical aspects, Division Engineers, District Engineers or Commanding Officers of separate installations are authorized to approve an adaptation which meets the obvious intent of the requirement and which is mutually satisfactory to his operating and safety organization."

Under the designated headings appear the following:

"Life Preservers

"Life preservers, vests, or belts shall be worn by all persons while—
*  *  *

"On structures extending over or adjacent to water except where proper guardrails or safety belts and life lines are provided.  *  *  *"

"Ring Buoys and Waterlights

"*  *  * scaffolds, platforms, and similar structures extending over or immediately adjacent to water shall have one ring buoy provided at intervals of not more than 200 feet.  *  *  *"

"Lifesaving or Safety Skiffs

"One or more lifesaving skiffs shall be provided at locations where men are working over or immediately adjacent to water. Lifesaving skiffs shall be kept afloat or ready for instant launching.  *  *  *"

"Ramps, Runways, Platforms and Scaffolds

"All scaffolds or working platforms of any nature shall be securely fastened to the building or structure, or if independent of the building shall be braced or guyed to prevent sway."

There was also received in evidence certain army regulations, manuals and directives. Among these are Army Regulation 100–70; Army Regulation 385–10; Paragraph 2009.1A, Volume 2, of General Manual of the Department of the Army, Corps of Engineers; and Safety Policy and Procedure Manual, North Pacific Division, Corps of Engineers, Portland, Oregon.

Army Regulation 100–70 provides that the Chief of Engineers, under the authority of the Commanding General, Services of Supply, and the Secretary of War, is charged with the direction of all work pertaining to the design and construction of buildings, structures, and utilities for the Army. Section 5 thereof, entitled "Orders and Regulations" states that general policies, details of organization, and contractual authority of field agents of the Corps of Engineers, together with detailed instructions governing administrative functions on new construction projects are prescribed by the Chief of Engineers and contained in Orders and

Regulations, Corps of Engineers, and manuals supplementary thereto.

Section 12 thereof provides:

"Safety engineering, fire prevention, and sanitation during construction.—A continuous and comprehensive accident-prevention program will be maintianed on new construction projects in accordance with such regulations as the Chief of Engineers may prescribe for the purpose of preventing deaths, injuries, and occupational sickness and disease of both Federal and contractors' personnel, and to prevent the destruction of and damage to materials and equipment. The Chief of Engineers will also be responsible for adequate fire protection and sanitation activities on all new projects during the construction period."

Army Regulation 385–10 is entitled "Safety—Army Safety Program." Section 1a thereof provides:

"Mission.—a. The mission of the Army safety program is to reduce and keep to a minimum accidental manpower and monetary losses of the Army, thus permitting more efficient utilization of its resources. To accomplish that mission, these regulations assign the responsibilities to insure continuing aggressive accident prevention effort throughout all echelons of command and in all Army operations and activities at all locations where United States Army personnel are stationed or employed, Army equipment is utilized, or property is owned or is under the control of the Army."

Paragraph 2009.1A, Volume 2 of the General Manual of the Corps of Engineers reads:

"It is essential to efficient and proper conduct of all work accomplished by or under the supervision of the Corps of Engineers that those responsible for management and supervision utilize every practicable means to protect workers, properties, and the public by eliminating or effectively controlling accident, fire and occupational health hazards and providing protective equipment, facilities, and apparel as hazards of the work required."

The Safety Policy and Procedure Manual is designed to provide the district engineers and the chiefs of the various staff components of the district organizations within the North Pacific Division with a concise statement of policy and procedure on accident prevention administration. Under the heading "General Policy" appears the following relating to the safety program:

"Safety Program

"(a) It is mandatory, for the efficient and proper conduct, of all work accomplished by or under the supervision of the Corps of Engineers in this Division, that those responsible for management and supervision utilize every practical means to protect workers, properties, equipment and the public by eliminating or effectively controlling accidents, fires and occupational health hazards and providing and insuring the use of protective equipment, facilities, and apparel as the hazards of the work or activity require.

"(b) A comprehensive and continuing safety program will be maintained throughout the North Pacific Division to insure that safeguards and precautions are taken to prevent injury or occupational sickness to personnel and damage to structures, materials and equipment. District Engineers will be responsible for the full application of the safety program at all activities under their jurisdiction, both civil and military.

"(c) The authorities, principles and procedures of the safety program will be applied to prevent damage to or loss of property and to prevent personal injury or death as a result of negligence, wrongful acts, omissions or other circumstances oc-

casioned by government and contractor employees acting within the scope of their employment."

In paragraph 10, under the heading "Application to Contract Operations" is the following:

"Contractors operating on contracts under the Corps of Engineers will be strictly held to their contractual safety obligations and equal and comparable attention will be given accident prevention on contract work as is extended to hired labor operations. In the application of accident prevention to either hired labor or contract operations the provisions of the Corps of Engineers' 'Safety Requirements' will not be construed as final and/or limiting. Any reasonable accepted and common safe practice or principle will be applied to the work as equal and under the same authority as those specifically outlined in 'Safety Requirements'. (Reference: Accident Prevention Article of Standard Construction Contract)"

The United States was represented on the project by inspectors whose duty it was to see that the contract provisions were complied with by the contractors, including the safety provisions contained in Article 30 thereof.

The record is clear that Kirk had been furnished with a safety belt to which was attached a rope four or five feet long, to be used for security purposes. The record is likewise clear that the inspectors of the United States were unaware of the fact that the she-bolts attaching the forms to the concrete structure had been removed. There were no safety nets under the scaffolding and no trail ropes, ring buoys or safety skiffs in or near the area where Kirk plunged into the river. Life preservers were available, but had not been used. There was no other safety or rescue equipment at hand.

The district court found that Kirk at and prior to the time of the accident had not secured himself to the form or structure with the rope attached to his safety belt. The district court further found that the employees of the contractors were negligent in the manner in which the forms were being moved, and that the United States was not negligent in any regard, either in connection with the safety regulations, or otherwise. The court concluded that the proximate cause of the accident was the negligent manner in which the forms were being moved by the contractors, and that the negligence of Kirk in failing to secure himself proximately contributed to the accident and Kirk's death. Judgment was entered in favor of the United States.

Appellants do not contend that the liability of the United States arises out of the express provisions of the contract. They do not contend that the United States had any control over the employees of the contractors as to the method or manner in which they performed their work. They do not contend that the United States exercised or attempted to exercise any control or direction over such employees. They do not contend that in causing the dam to be constructed the United States was engaged in an "extra hazardous" activity. They do not contend that the United States interfered in any way with the work being performed by the contractors. They do not contend that Kirk's death was in any manner caused by the condition of the premises on which the construction work was being performed.

■■ In short, the appellants recognize the generally applied and well established rule that a contractee is generally not liable for the torts of an independent contractor or of the latter's servants. See Am.Jur. Vol. 27, § 27, page 504 et seq. and 1959 cumulative supplement thereto. Apparently this rule prevails in the State of Idaho. Moon v. Ervin, 64 Idaho 464, 133 P.2d 933; Gifford v. Nottingham, 68 Idaho 330, 193 P.2d 831. The fact that the United States retained the right to inspect the work under construction to see that the provisions of the contract were carried out and also retained the right to stop work if they were not is not sufficient in itself to make the

United States liable for damage resulting from negligence of the contractors in their performance of the contract. Gallagher v. United States Lines Co., 2 Cir., 206 F.2d 177; Alexander v. Frost Lumber Industries, D.C., 88 F.Supp. 516, affirmed 5 Cir., 187 F.2d 27; McDonald v. Shell Oil Co., 44 Cal.2d 785, 285 P.2d 902.

While appellants rely on many specifications of error, they largely revolve around appellants' main contention which is that the United States was under a legal duty to Kirk to inspect and test the scaffold and movable forms and to carry out a continuous and comprehensive accident prevention and rescue program for the protection not only of the employees of the United States but of the employees of the independent contractors, of which Kirk was one. Appellants argue that such legal duty is enjoined by statute, by the Army regulations, safety manuals and directives above mentioned. They further contend that such legal duty is non-delegable and that contributory negligence constitutes no defense to an action predicated on the breach of such duty.

Appellants claim that such legal duty was breached by the failure of the employees of the United States (a) to inspect the joined panels which were being moved; (b) to see that Kirk was provided with a rope of sufficient length to be attached to his safety belt so that he could be secured while moving from the scaffold where he was working to the safety of an adjoining form which was not to be moved; (c) to discover that the three-quarter inch bolts securing the forms together and some of the she-bolts had been removed on orders of the contractors several days before the accident; (d) to require the installation of nets under the scaffolds; (e) to see that trail ropes, life rings and rescue equipment were available in the area where Kirk plunged into the river; and (f) to provide a water rescue procedure plan.

Finally, appellants claim that the employees of the United States were negligent by act and omission in breaching this legal duty, and upon such premise the appellants are entitled to recover against the United States under the Federal Tort Claims Act.

The fatal weakness of appellants' position, as we see the problem, is that appellants have utterly failed to establish the existence of the legal duty upon which they rely. The statute relied upon by the appellants to support their position is 33 U.S.C.A. § 701b, which provides:

"* * * improvements of rivers and other waterways for flood control and allied purposes shall be under the jurisdiction of and shall be prosecuted by the Department of the Army under the direction of the Secretary of the Army and supervision of the Chief of Engineers, * * *"

■■ While this statute clearly authorizes the execution of the contract on behalf of the United States, we are unable to find therein any intent, expressed or implied, on the part of Congress to establish a duty of care on behalf of the United States toward employees of an independent contractor, or to authorize the creation of such duty by the Secretary of the Army or the Chief of Engineers through the issuance of regulations, manuals or directives. The statute is silent as to the creation of any duty of care on the part of the United States toward the class of which Kirk was a member. The statute defines no degree of care which shall be exercised by the Department of the Army under any specified circumstances. If the United States is to be made liable to the employees of independent contractors engaged in the construction of a project under the jurisdiction of the Department of the Army, such liability must be created by legislative act and not judicial fiat. The general rule is that a statute which does not purport to establish a civil liability, but merely makes provision to secure the safety or welfare of the public as an entity, is not subject to a construction establishing a civil liability. 50 Am. Jur. 582, Statutes, § 586.

Since the statute upon which appellants rely created no legal duty on the part of the United States, it necessarily follows that no legal duty on the part of the United States was created by regulations, manuals and directives purportedly authorized under the statute. Regulations of a department must be issued within the powers conferred by Congress and must be addressed to and be reasonably adapted to the enforcement of an Act of Congress. See 91 C.J.S. United States § 31, p. 68.

We agree with the following statement which appears in the memorandum decision of the trial court:

"The voluntary assumption of such a program [accident prevention and safety program] for the welfare of all parties concerned should not create liability on the part of the defendant to the employees of contractors where the performance, or failure to perform, in no wise increases the hazard to the employees of the contractor beyond that which would otherwise have been present. Every Government employee must trace the duties of his job to some law, regulation, or order, but this does not mean that in every such case there is thereby established a duty of care on the part of the employee and the Government toward those who may be incidentally benefited if those duties are properly performed, or toward those who may be incidentally injured if those duties are not properly performed. cf. Mid-Central Fish Co. v. United States, D.C., 112 F.Supp. 792, affirmed National Mfg. Co. v. United States, 8 Cir., 210 F.2d 263, and the concurring opinion of Judge Johnsen in National Mfg. Co. v. United States, 8 Cir., 210 F.2d 263, certiorari denied 347 U.S. 967, 74 S.Ct. 778, 98 L.Ed. 1108."

The judgment of the district court is affirmed.

POPE, Circuit Judge (concurring).

I agree that the judgment of the district court must be affirmed; but since I have certain reservations with respect to the reasons given for the affirmance in the majority opinion, I prefer to base my concurrence upon another ground.

The gist of the majority opinion seems to be stated in the quotation from the memorandum decision of the trial court which appears at the end of the opinion. The statement there approved recites: "The voluntary assumption of such a program [accident prevention and safety program] for the welfare of all parties concerned should not create liability on the part of the defendant to the employees of contractors where the performance, or failure to perform, in no wise increases the hazard to the employees of the contractor beyond that which would otherwise have been present." I think there are two things wrong about that statement. First, I think it cannot be said that the failure of the Government's Construction Engineer and Inspector to carry out the duties prescribed for them in Article 30 of the contract and of the manual "Safety Requirements", and of the other manuals and regulations from which the opinion quotes, did not increase the hazard to Kirk.

Had these officers insisted upon the life preservers, the ring buoys, the life saving skiffs, or other rescue equipment, the hazard to an employee who fell into the water, either because of the negligent manner in which the forms were being removed, or because of the failure to furnish a net, would have been substantially lessened. It is self-evident, I think, that had these Government officers performed their prescribed duties, Kirk might not have lost his life.

The second thing wrong about that statement is that it overlooks the principle illustrated by the ancient story of the blind man crossing the street. If a bystander simply observes a blind man trying to thread his way through traffic across a busy street and does nothing he is not responsible for an accident to the blind person; on the other hand, if he voluntarily assumes to help the blind man across the street he immediately comes

under a duty to perform his guidance with reasonable care. This is the principle applied and illustrated in the case of Indian Towing Co. v. United States, 350 U.S. 61, 76 S.Ct. 122, 100 L.Ed. 48. There the action based on the provisions of the same act here involved was predicated on the negligence of the Coast Guard in the operation of a lighthouse. No statute required the Coast Guard to undertake the lighthouse service. I assume here also that no statute or regulation having the force of law required the Government Contracting Engineer or the Government Inspector or the department of which they were members to institute, carry on or enforce a safety inspection program.

But in the Indian Towing case the Coast Guard did undertake the lighthouse service. Speaking of the consequence of such an undertaking generally, the Court said (350 U.S. at page 64, 76 S.Ct. at page 124): "[I]t is hornbook tort law that one who undertakes to warn the public of danger and thereby induces reliance must perform his 'good samaritan' task in a careful manner." The Court went on to say: "The Coast Guard need not undertake the lighthouse service. But once it exercised its discretion to operate a light on Chandeleur Island and engendered reliance on the guidance afforded by the light, it was obligated to use due care to make certain that the light was kept in good working order; and, if the light did become extinguished, then the Coast Guard was further obligated to use due care to discover this fact and to repair the light or give warning that it was not functioning. If the Coast Guard failed in its duty and damage was thereby caused to petitioners, the United States is liable under the Tort Claims Act."

It seems to me that that precise principle might be applied to demonstrate a duty on the part of the Government and the corps of engineers of the Army to exercise reasonable care in the performance of the service which was voluntarily undertaken by them in the contract and in the practical operation of the construction enterprise. I call attention to the purpose stated expressly in the sentences quoted from Article 30 of the contract: "In order to provide safety controls for protection to the life and health of employees and other persons; * * * the Contractor will comply with all pertinent provisions of the manual 'Safety Requirements' approved by the Chief of Engineers. * * * (c) The Contracting officer will notify the Contractor of any noncompliance with the foregoing provisions and the action to be taken."

I note that while the article in question imposes certain obligations on the contractors, it also prescribes certain duties undertaken by the Contracting officer for the corps of engineers. Not only was this obligation on the part of the Contracting officer made a part of the contract, but it was further implemented by the Army regulations and the Safety Policy and Procedure Manual set forth in the majority opinion.

It is also plain that the Army employees charged with this undertaking were actually on the job; and they did, albeit in a half-hearted manner, carry on the same safety inspection work. Thus the Inspector Emore testified that he was inspecting to see that the safety regulations were complied with: "Q. Will you state what those contract provisions were that you were inspecting the enforcement of so far as safety was concerned? A. To see if they had safety belts on and see if scaffolding was there." He stated that his instructions were to "see if there is safe working conditions around in general."

It also seems plain that there was an obvious failure to discover or call attention to the lack of safety equipment either to catch a man after a fall or to save him from the water. For these reasons I find it difficult to agree that a duty cannot arise out of a voluntary assumption of a program of accident prevention and safety.

The court found that the deceased William M. Kirk was guilty of contributory

negligence.[1] While appellant argues that in view of the short length of rope provided for his belt, and in view of the necessity for Kirk to move about on the scaffold, he could not be charged with negligence, it cannot be said that this finding of the trial court was clearly erroneous. It was for the trial judge to say whether Kirk conducted himself with reasonable care.

Appellant seeks to avoid the effect of this finding of negligence by arguing that Kirk's failure to have the rope connected with the steel structure was not the proximate cause of his death. This is stated in the appellant's brief as follows: " * * * even if the Plaintiff's deceased was contributorily negligent at the time the scaffold broke, this negligence is not a bar to recovery based upon Defendant's negligence to rescue him once he began to fall and later after he was swimming in the river." This contention is developed by appellant further as follows: "In our case, Defendant was charged with the duty of having a safety program which included rescuing persons who may fall in the water. The evidence conclusively shows that the fall from the scaffold into the river did not injure Mr. Kirk, for after he landed in the water he was heard to shout and was seen to paddle to keep himself afloat. The evidence shows that after he was swept into the tunnel under the dam he was never seen again until found dead miles downstream. He clearly drowned after being in the water. The cause of his death is not related to any possible negligence in his not having a safety belt fastened, but is proximately related to failure to either catch him in his fall before he entered the river or to rescue him once he was in the river. The case is very similar to the steam boat case above cited, the liability of Defendant in our case resting on its pre-existing charge by statute to provide safety measures, instead of upon notice of peril, as set out in that case."

The steam boat case referred to in the language just quoted was the case of Pate v. Tar Heel Steam Boat Co., 148 N.C. 571, 62 S.E. 614, where, as appellant says, the steamboat company was held liable " * * * upon the ground that, after discovering the peril of the plaintiff's intestate, the master and servants of (steamboat company) failed to make all reasonable efforts to rescue him. * * "

This, of course, was a typical case for the application of the so-called "last clear chance" doctrine. That doctrine is applied under circumstances such as those stated in Short v. Boise Valley Traction Co., 38 Idaho 593, 225 P. 398, 399, where the court quoted from Grand Trunk R. Co. of Canada v. Ives, 144 U.S. 408, 12 S.Ct. 679, 36 L.Ed. 485: "[T]he contributory negligence of the party injured will not defeat the action if it be shown that the defendant might, by the exercise of reasonable care and prudence, have avoided the consequences of the injured party's negligence."

Generally speaking the rule is applied when it can be said that "notwithstanding plaintiff's contributory negligence defendant may be found liable if the jury should find that plaintiff was in a position of peril of which he was oblivious, that defendant was aware, or had he exercised reasonable care would have been aware, of plaintiff's peril and obliviousness thereof, and that *thereafter* defendant by the exercise of reasonable care could have avoided the accident." Rankin v. Shayne Brothers, Inc., 98 U.S.App.D.C. 214, 234 F.2d 35, 38. (Emphasis mine) See also Schweitzer v. Gilmore, 2 Cir., 251 F.2d 171. Obviously this is not just such a case, for it is apparent that after Kirk fell into the water the appellee or its representatives did not then have the chance

---

1. "IX—That the deceased, William M. Kirk, was guilty of contributory negligence so as to bar recovery by his heirs in this action by reason of the fact that he did not exercise due care in having the rope connected with his safety belt attached to the steel structure."

or opportunity, under the circumstances then existing, to prevent his death.

What appellant is arguing for is an extension of the principle applied in the ordinary case involving the last chance doctrine to a case where the defendant would have had an opportunity to observe the danger of the plaintiff but is unable to rescue or to avoid injury to him because of prior negligence in failing to provide proper equipment through which he might have had a last chance to avoid the injury. Appellant's effort so to extend the last chance principle finds some support in the Restatement of the Law of Torts, in Comment (b) under § 479. There the statement is made: "The duty of vigilance which the defendant owes to plaintiff may require not only that the defendant must be attentive to his surroundings, but also that he shall be so equipped as to make his attention effective."

Mr. Prosser, in his text on the Law of Torts, (2nd ed., C. 10, § 52, p. 295) discusses the theory which appellant here presents as follows: "A further problem arises where the defendant, after discovery of the danger, does what he can to avoid the injury, but his prior negligence prevents his efforts from being effective—as, for example, where he tries to stop his car, but cannot do so because of defective brakes. No reason is evident in such a case for distinguishing between the antecedent negligence of the defendant and that of the plaintiff who has got himself into danger; and most courts deny recovery."

Prosser cites the cases pro and con noting that recovery was sustained in the English case of British Columbia Electric Ry. Ltd. v. Loach, 1 A.C. 719; and similar recovery allowed in the decisions in five states in the United States. The weight of authority is to the contrary as the cases cited by Prosser demonstrate.[2]

So far as I can discover, the Supreme Court of Idaho has never had occasion to deal with a set of facts which would give rise to a discussion of this precise problem. It would appear therefore that we are not warranted in assuming that the State of Idaho would follow the minority view in respect to this question. On the other hand, it would appear that the Idaho Supreme Court's statement of the last clear chance doctrine tends to be in line with the majority view which would reject the position sought to be taken by the appellant. Thus in Laidlaw v. Barker, 78 Idaho 67, 297 P.2d 287, 291, the Idaho court emphasizes the necessity of lapse of time from the moment when plaintiff's peril becomes apparent, sufficient to permit the defendant after that time to have a last clear chance to avoid the accident. Speaking of the doctrine the court there stated: "That doctrine implies thought, appreciation, mental direction and lapse of sufficient time effectually so to act as to save another from injury to which he has negligently exposed himself. It is not applicable where the emergency is so sudden that there is no time to avert the accident. In the case here, the act which created the peril occurred at practically the same time as the accident in that only six-tenths to seven-tenths of a second, mathematically calculated, elapsed from the time the Laidlaw boy's peril became apparent to appellant Barker before the accident; under the circumstances appellants did not have a last clear chance to avoid the accident. The last clear chance must be a clear one."

I am therefore of the view that a finding of decedent's negligence, which of course was a proximate cause of what happened to him, is a bar to his recovery and for this reason alone the judgment must be affirmed.

---

**2.** Harper and James, The Law of Torts, § 22.13, note 34, collects the same cases, and the authors say (p. 1254): "In the situation we are discussing the great weight of American authority, logically enough, refuses to hold the defendant."

A most thorough and useful discussion of the precise question here referred to is to be found in Anderson v. Bingham & Garfield Ry. Co., 117 Utah 197, 214 P.2d 607.