432 P.2d 780

Nathan E. GATES, Plaintiff-Respondent and Cross-Appellant,

v.

PICKETT & NELSON CONSTRUCTION CO., Defendant-Respondent,

and

Ernest F. Gaffney, R. Doyle Symms, and C. Ed Flandro, as Idaho Board of Highway Directors, Defendants-Appellants and Cross-Respondents.

No. 10035.

Supreme Court of Idaho.

Oct. 18, 1967.

Jack C. Riddlemoser, Dept. of Highways, Boise, for appellant-cross-respondent, Dept. of Highways.

Gee, Hargraves & Armstrong, Pocatello, for respondent, Nathan E. Gates.

Holden, Holden & Kidwell, Idaho Falls, for respondent, Pickett & Nelson Const. Co.

SPEAR, Justice.

In plaintiff's third amended complaint, the first in which the Idaho Board of Highway Directors was made a party to the action in addition to Pickett & Nelson Construction Co. as defendants, the theory of, and the basis for, plaintiff's action is set forth in paragraphs IV and V, as follows:

"IV.

"That the defendants surveyed and relocated the plaintiff's existing water ditch and hauled in or caused to be hauled in new dirt building a ditch on top of the ground at a higher elevation and installing a small siphon under the new highway and delayed and caused delay in the delivery of the plaintiff's irrigation waters all to the detriment of his crops and the interference with his water supply.

"V.

"That the acts of the defendants in improperly reconstructing the ditch so that it became built up and clogged with dirt and operated at such an elevation that the plaintiff's crop was approximately 3,000 bales of hay less than it should have been had the water flow not been interfered with."

Thus the action is one sounding in tort for the interference by the defendants with plaintiff's water supply through the relocation of the existing water ditch and the improper reconstruction of the same, resulting in damage to plaintiff's crops.

The pertinent facts are as follows: For about 35 years plaintiff Gates (respondent and cross-appellant herein but referred to as Gates for clarity and simplification)

owned and operated a 120-acre farm located about 2½ miles southwest of McCammon, Idaho. Seventy acres of this were irrigated with about 25 acres in hay land and the balance in pasture. Prior to 1964 irrigation water reached the Gates property by a ditch which followed the natural contours of the land, had no built up banks, and had capacity of delivering water in more than sufficient quantity. The exact amount of water available to Gates by use of the old ditch was never measured but the evidence discloses Gates was *entitled to* 105 inches in his own right and 42 inches of his neighbor's right, for a total of 147 inches. The old ditch crossed the road through a 30- to 40-foot culvert by use of which Gates encountered no trouble in receiving all the water to which he was entitled "and more."

In April 1964 the State Highway Department began construction of an overpass and related structures on Interstate Highway 15, and in the process of such construction is was necessary to relocate a portion of the old ditch in the vicinity of this overpass. The general and prime contractor for this construction was Pickett & Nelson Construction Co., a defendant and respondent herein. The plans and specifications provided by the Highway Department provided a 21-inch concrete siphon 416 feet in length as well as a levee built upon and above the natural contour of the land with a foot-and-a-half-deep ditch constructed at the bottom thereof. The headgate in the canal for the new ditch was installed by Boesiger Construction Company, the siphon was installed by the Idaho Concrete Products and the levee construction by McNutt Construction Company, all three companies being subcontractors of Pickett & Nelson.

The spring of 1964 was an unusually wet one, i. e., there was an unusual amount of rain. Because of this the ditch-cleaning activities of the canal company were delayed, and whereas the water was usually made available for irrigation sometime in April, it was not made available in 1964 until May 27th. However, the headwalls for the siphon and new ditch were not installed until June 2d. Thus this is the earliest date upon which water could have been turned in to the new ditch. Construction of the headwalls was the duty of Boesiger Construction Company, one of the subcontractors. Because of some difficulty with the installation of the siphon (which was the duty of Idaho Concrete Products, another subcontractor), the water was in fact not turned into the new ditch and siphon until about the 6th or 7th of June. At this time there was discovered a high spot in the new ditch which prevented the water from running as freely as it should have. This fact was relayed to Pickett & Nelson, the prime contractor, who also was responsible for the digging of the ditch, and this defect was repaired on June 11, 1964, by Pickett & Nelson. From this date the ditch was ready and available for delivery of water to the Gates property.

Gates however testified that at no time during the summer of 1964 did he receive more than one-half of the water to which he was usually accustomed through the use of the old ditch. Gates also testified that because of the diminished amount of water made available to him, he lost about one-half of his hay crop which he valued at about $1,675, and that he suffered a loss on his pasture land of $500.

There is no evidence establishing the amount of water made available to Gates in the old ditch and the only evidence adduced concerning the capacity of the new ditch established it running at the rate of 217 miners inches. This measurement was taken in August or September of 1964, but there was no substantial change in the amount of water carried by the ditch and siphon throughout the summer.

At the completion of the plaintiff's case in chief, Pickett & Nelson moved for a directed verdict or an involuntary dismissal, which was granted by the trial court. The Highway Board also moved for an involuntary dismissal at this time, but this was denied. At the completion of the entire case, the Highway Board again moved for

a directed verdict which was again denied by the trial court. The jury brought in the verdict in favor of the plaintiff Gates and against the defendant State of Idaho in the amount of $3,500. Judgment in this amount was entered by the clerk of the court on September 13, 1966. Upon motion by the Highway Board for a judgment notwithstanding the verdict the trial judge granted a reduction in the verdict to $2000 and judgment in this sum was entered on the 18th day of October, 1966. From this judgment the Highway Board appealed, and Gates cross-appealed, additionally appealing from the order granting the involuntary dismissal as against Pickett & Nelson.

The principal contention of the Highway Board throughout the entire course of this litigation since it was made a party thereto, has been simply that Gates' action as alleged in this third amended complaint is one sounding in tort for which the Highway Board, as an instrumentality of the State of Idaho, is immune concerning any damages resulting therefrom. This was first raised in a motion to dismiss the complaint as to the Highway Board, which motion was later treated as one for a summary judgment under Rule 12(b) I.R.C.P. In an affidavit by the Commissioner of Insurance for the State of Idaho, attached to the motion for summary judgment, it was established, without contradiction, that the State of Idaho had no insurance in force and effect during the summer of 1964 covering negligent acts of employees of the State of Idaho and the Idaho Department of Highways in the design, construction and maintenance of state highways in the State of Idaho.

In the memorandum decision, which disposed of this motion for summary judgment, the trial judge carefully pointed out that while the State of Idaho was not subject to suit by reason of torts unless covered by insurance, the Highway Board would be obligated to compensate any landowner if there had been a *taking of property without compensation*. The trial judge then specifically pointed out the problem in this language:

"If in this instance they have taken the property of the plaintiff by failure to adequately provide for the flow of water, which plaintiff is entitled to, it, in effect, amounts to a taking by the State and they should be required to compensate the landowner for such taking, even though such taking may have been by reason of error in the engineering, or by error on the part of their employees in directing the construction of the channel in question."

It is important to note that this memorandum decision is dated the 20th of April, 1966. The trial began on the morning of September 9, 1966, a period just a few days short of five months, during which no attempt was made by Gates to amend the third amended complaint to properly plead an inverse condemnation action against the Highway Board. A motion to amend after the jury had already been chosen and the parties prepared for immediate trial was properly denied by the trial court. I.R.C.P. 15(a)

That the State of Idaho and any of its subdivisions or departments, such as the Board of Highway Directors, are immune from liability for the torts of their employees unless such immunity has been waived to the extent of liability insurance obtained by the State or its subdivision, is a rule of long standing in Idaho. Davis v. State, 30 Idaho 137, 163 P. 373; State v. Parsons, 58 Idaho 787, 80 P.2d 20; Pigg v. Brockman, 79 Idaho 233, 314 P.2d 609; and Bare v. Department of Highways, 88 Idaho 467, 401 P.2d 552. Particularly applicable is the following language from Bare v. Department of Highways, supra:

"The Department of Highways is an administrative department of the state government. I.C. § 40-111. In the absence of consent or waiver of sovereign immunity by the legislature, neither the highway department, nor any of its officers or agents, can subject the state to tort liability. The only liability for damages which can be imposed upon the state, in a case such as this, is that

imposed by the constitution, art. 1, § 14, incident to the taking of private property for a public use." (at p. 471, 401 P.2d at p. 554)

So the Highway Board has been consistently correct in its contention that Gates had neither plead nor proven any actionable damages against the Highway Board or the State of Idaho, and its motion for a judgment notwithstanding the verdict in its favor and against the plaintiff Gates should have been granted.

■ However, Gates assigns as error in his cross-appeal the failure of the trial court to permit him to amend his third amended complaint so it would have contained allegations of an inverse condemnation action against the Highway Board. As previously noted, this motion was not made until after the start of the trial and the jury had already been selected. Additionally, such motion was made nearly five months after the desirability of such amendment was pointed out by the trial court in its memorandum decision on the Highway Board's motion for a summary judgment. Under Rule 15(a) I.R.C.P., a party may amend his pleading *once* as a matter of course, at any time before responsive pleading is served. Otherwise a party may amend his pleading *only by leave of court* or by written consent of the adverse party; and the rule provides that such leave shall be freely given when justice so requires. Thus Gates' motion to amend his third amended complaint when the trial had already proceeded through the selection of a jury is necessarily left to the sound discretion of the trial judge, and in the absence of a showing of the abuse of such discretion the ruling of the trial court should not be set aside on appeal. Grant v. Clarke, 78 Idaho 412, 305 P.2d 752; Andrus v. Irick, 87 Idaho 471, 394 P.2d 304. To have granted the motion to amend at that late date would have permitted Gates to have changed entirely the theory of his action from one sounding in tort to one in inverse condemnation. The measure of damages is vastly different in the one action than in the other. The Highway Board was prepared to defend a tort action. To have secured evidence to properly defend an inverse condemnation action would necessarily have required considerable time. The trial court committed no error in denying the motion to amend.

■ During the course of the trial Gates attempted to introduce evidence of the market value of his property before and after the "taking" of his property by the acts of defendants. Objections were timely made by the Highway Board and sustained, on the grounds that such evidence was outside the scope of the pleading. In other words, the trial court ruled that Gates had couched his complaint in terms of a tort action and that evidence properly introduced in an inverse condemnation suit was inadmissible in the tort action. Gates then made offers of proof of two witnesses, who, if permitted to testify, would give opinion evidence as to the value of Gates' property immediately prior to and immediately after the "taking." These offers were denied. On his cross-appeal Gates assigns as error this exclusion of such proffered evidence. The trial court was consistent and correct in denying Gates' motion to amend the pleadings to allege an inverse condemnation action and subsequently excluding any evidence offered by Gates for the purpose of proving damages in an inverse condemnation action. There is, therefore, no merit to Gates' contention in this respect. Therefore the pleading and proof by Gates was properly restricted to alleged damages resulting from tortious conduct on the part of contractors or employees hired by the Idaho State Board of Highway Directors for which no recovery could be allowed because of the sovereign immunity of the Board from such torts. An inverse condemnation action was neither properly alleged nor in any manner proven against the Highway Board and its motion in its favor for a judgment notwithstanding the verdict should have been granted.

The foregoing portion of this opinion makes unnecessary any ruling or comment upon the additional assignments of error raised by Gates in his cross-appeal.

However, on his appeal from the order of the court granting an involuntary dismissal as against defendant Pickett & Nelson, Gates raises the question of whether or not a prime contractor is liable for the alleged torts of its subcontractors. It is Gates' contention that Pickett & Nelson was responsible for (a) delay in transmitting plaintiff's water, (b) cutting the alleged ditch without grade stakes, (c) turning water into a ditch which was obviously faulty and which they didn't even check for compliance with specifications, and (d) failure to amply construct the ditch embankments, flumes and other conduits (siphon) so as not to in any way injure others, as required by the statutes. With the exception of (b) all these alleged acts of negligence or omissions to comply with duties imposed by statute were committed or omitted by subcontractors of Pickett & Nelson.

The general rule is that a general contractor is not liable for injuries occasioned by the negligent acts or omissions of his subcontractor or of the latter's servants, unless the circumstances bring the case within some exception to the general rule. Of the various recognized exceptions to the rule, the only one possibly applicable here is where the general contractor retains or exercises control over the work of the subcontractor or his servants, other than a limited power of general supervision for the purpose of seeing that the subcontractor did the work properly according to the plans and specifications. 57 C.J.S. Master and Servant § 609, pp. 380–381; Kirk v. United States, 161 F.Supp. 722 (D. Idaho 1958), aff. 270 F.2d 110 (9th Cir. 1959); De Luca v. Fehlhaber Corp., 38 Misc.2d 184, 237 N.Y.S.2d 852 (NYC Civil Court, 1963); Washington Air Compressor Rental Co. v. National Union Ins. Co. et al, 165 A.2d 482 (D.C.Mun.App.1960); Townsend v. City of Pittsburgh, 383 Pa. 453, 119 A.2d 227 (1956).

This rule is particularly applicable where the subcontractor's work is performed under its own control and is directly supervised by the State of Idaho through the resident engineer of the Highway Department. Southeast Construction Co. Inc. v. Ellis, 233 Ark. 72, 342 S.W.2d 485 (1961).

Additionally, where a contractor, either the general contractor or a subcontractor, performs his work according to plans and specifications, the contractor is not liable for damage to property resulting from such construction. Puget Sound National Bank of Tacoma v. C. B. Lauch Construction Co., 73 Idaho 68, 245 P.2d 800; Myers v. United States, 323 F.2d 580 (9th Cir. 1963); Southeast Construction Co. v. Ellis, supra; Engler v. Aldridge, 147 Kan. 43, 75 P.2d 290 (1938).

In applying these rules to the facts adduced at the trial, the trial court committed no error in granting the motion for an involuntary dismissal against Pickett & Nelson. Gates first claimed negligence in the delay in transmitting the irrigation water to his property. No water was available in the entire canal system until May 27th, whereas the water ordinarily was made available sometime in April. Due to the extremely wet conditions of the spring of 1964, the canals could not be properly cleaned by the irrigation district until May 27th. The delay between then and June 11th was occasioned (1) by failure of the Boesiger Construction Company to install the headgate in the canal for the new ditch until June 2d, (2) by failure of Idaho Concrete Products to properly install the siphon until about the 5th or 6th of June, and (3) by failure of Pickett & Nelson to properly cut the ditch thus necessitating repair by additional cutting, under the direction and supervision of the resident engineer of the highway department, on June 9th through the 11th. The entire new ditch system was accepted by the State of Idaho, through the Highway Board, on June 11, 1964, although formal acceptance of the entire project was

not forthcoming until sometime in August, 1965.

The next allegation of negligence contained in the assignments of error by Gates is the cutting of the ditch without grade stakes. This was performed by Pickett & Nelson. It is a companion of the third allegation of negligence, i. e., "turning water into a ditch which was obviously faulty and which they didn't even check for compliance with specifications." The evidence in this respect shows that the grade stakes which had originally been set by the highway department had been destroyed or obliterated by the McNutt Construction Company in the course of constructing the levee. Pickett & Nelson cut the ditch a foot and a half deep according to the plans and specifications, relying upon McNutt Construction Company, a subcontractor, for having also complied with such plans and specifications. The same erroneous assumption was indulged in by the Highway Board through its resident engineer.

It is true that after the water was first turned into the new ditch a spot about four inches high was discovered. The water was turned out, this error remedied by Pickett & Nelson by recutting the ditch in part and the work thereon accepted by the State on June 11, 1964. From this evidence the trial court could have found and concluded that plaintiff (Gates) had failed in his burden of proof of this allegation of negligence on the part of Pickett & Nelson. No reversible error was committed by the court in so ruling.

The last allegation of negligence is the alleged failure to amply construct the ditch embankments, flumes and other conduits (siphon) so as not to in any way injure others. Such negligence, if any, must be attributed to either the McNutt Construction Company or Idaho Concrete Products.

The supervisory control over, and relationship between, the State of Idaho Department of Highways, Pickett & Nelson, and the subcontractors is best pinpointed by the following testimony by Mr. Bradshaw, the resident engineer:

"Q On re-direct examination, Mr. Bradshaw, you testified concerning the contract relation of McNutt Construction Company, Boesiger Construction, and Idaho Concrete Products. To clarify your examination, or your testimony, it is my understanding from your prior testimony that each of these sub-contractors maintained supervisory personnel; is that correct?

"A That's right.

"Q And you worked directly with the sub-contractors in inspection and completion of the work they were performing?

"A That's right.

"Q And you at no time observed any control or any direction being used by the general contractor, Pickett & Nelson, over their work; is that correct?

"A No, sir.

"Q You at no time observed it?

"A At no time observed it."

It is true Mr. Bradshaw also testified:

"Q Now, you said that you had been, that you had observed no supervision or control by Pickett & Nelson of the sub-contractors, and by that, you do not mean to imply to the jury, do you, Mr. Bradshaw, that Pickett & Nelson's superintendent didn't control the sub-contractors, do you?

"A No. They definitely are in control, but anytime that—they had any problem, they would come to us as well as Pickett & Nelson. The subcontractors worked directly with us.

"Q Yes. But so far as overall management of the project, the State looked to Pickett & Nelson, did they not; they were the people that were ultimately responsible.

        *    *    *    *    *    *

"A * * * Yes."

Other evidence shedding light on the type of control exercised by Pickett & Nelson over the subcontractors is gleaned from the following testimony of Mr. Davidson, the construction superintendent for Pickett & Nelson on the particular job involved:

"Q Now, all of these [subcontractors] worked under your direction and supervision, did they not, sir?

"A They worked under my direction for correlation.

"Q Well, if you wanted anything done, you directed them to do it, didn't you, sir?

"A I went and asked them to do it.

"Q And you had a contract with them, which gave you the right to tell them what to do, didn't you?

"A Yes."

And in another portion of his testimony Mr. Davidson testified as follows:

"Q Just a few questions. Now, counsel interrogated you concerning the work performed by McNutt Construction, Boesiger, and Idaho Concrete. Now, did you, in any way, supervise the work performed by those contractors?

"A No, sir.

"Q Did you, in any way, direct the performance of the work by their employees?

"A No.

"Q Did you designate how they were to perform their work?

"A No. They are supposed to be specialists in their fields.

"Q Did you supervise and inspect their work?

"A Not with inspection in mind. I looked at it to see the extent of progress that they were making, but that was all.

"Q Did you supervise it as to quality?

"A If I see anything out of line, I would bellyache about it.

"Q Were they supervised directly by the State?

"A Yes."

From this evidence it was proper for the trial court to hold that the supervision and control over the subcontractor was exercised more by the Department of Highways through its resident engineer than by Pickett & Nelson, the general contractor. Therefore this is not one of those cases falling within the exception of the general rule, and Pickett & Nelson should not be held responsible for the negligence, if any, of the subcontractors.

Additionally, with the exception of McNutt Construction Company, the evidence discloses that Pickett & Nelson and its subcontractors performed the required work according to the plans and specifications of the Department of Highways, and the entire new ditch provided for in such plans and specifications was accepted by the Department of Highways of the State of Idaho as of June 11, 1964. As pointed out in Myers v. United States, supra:

"To the extent that the work performed by McLaughlin, Inc., was done under its contract with the Bureau of Public Lands, and in conformity with the terms of said contract, no liability can be imposed upon it for any damages claimed to have been suffered by the appellants." (323 F.2d at 583)

The language used by this court in Puget Sound National Bank of Tacoma v. C. B. Lauch Construction Co., supra, is also applicable here:

"A contractor is required to follow the plans and specifications and when he does so, he cannot be held to guarantee that the work performed as required by his contract will be free from defects, or withstand the action of the elements, or that the completed job will accomplish the purpose intended. He is only responsible for improper workmanship or other faults, or defects resulting from his failure to perform." (73 Idaho at 77, 245 P.2d at 805)

Even assuming the evidence had been sufficient to prove negligence, either on the part of Pickett & Nelson or one or more of its subcontractors for which Pickett & Nelson was responsible, recovery by Gates would be precluded by failure to prove damages resulting from such negligence. After agreeing that the new ditch was repaired by June 11th, Gates testified as follows:

"Q Now, if you had gotten water after that date, do you have any estimation as to how that would have affected your hay crop?

"A Well, it wouldn't affect it any if I got what I should have had.

"Q So if you had gotten your water after June 11th, it wouldn't have affected your hay crop at all?

"A Not if I had got what water I should have had.

"Q Fine. Would it have affected your pasture?

"A No, sir."

After the court had ruled in favor of Pickett & Nelson on its motion for an involuntary dismissal at the completion of Gates' case in chief, counsel for Gates moved to reopen for the purpose of clarifying the answers given in the testimony just quoted, on the basis that he had not understood the question. The trial court granted this motion, and in the proceedings prior to again closing his case Gates testified as follows:

"Q (By Mr. Hahn) Now, assuming on the 11th of June, I want to make this very clear to you so there is no misunderstanding, and if my question in any way is not clear, Mr. Gates, be sure and stop me, but assuming on the 11th of June that you would have received your whole head of water, everything you were entitled to, would your hay crop have been damaged?

"A (By the Witness) To a certain extent.

"Q To what extent, sir?

"A Well, it would have been—well, not knowing just exactly how much, but it would have been some. It would have been several days of irrigating.

"Q How much would you say on several days of irrigating?

"MR. GEE: May I have the same objection for the record, please, that it is incompetent and outside the scope of the examination?

"THE COURT: Certainly.

"MR. GEE: And it's speculative.

"A (By the Witness) Am I supposed to still try to answer?

"THE COURT: Yes.

"A (By the Witness) Well, I couldn't tell you exactly.

"Q (By Mr. Hahn) You couldn't put any dollar figure on it?

"A (By the Witness) No, sir."

This is the evidence upon which Gates must rely as establishing the damages he suffered as the result of the alleged negligence of Pickett & Nelson and its subcontractors. Thus the record is devoid of any competent evidence of damages for which Pickett & Nelson could be held responsible. Casey v. Nampa & Meridian Irrigation District, 85 Idaho 299, 379 P.2d 409; Kaess v. Wilson, 132 Colo. 443, 289 P.2d 636 (1955); Gable v. Pathfinder Irrigation District, 159 Neb. 778, 68 N.W.2d 500 (1955).

■ Moreover, Gates' principal claim for damages lies in the fact that the new ditch would not deliver the amount of water *to which he was accustomed* from the old ditch. There is competent evidence from which the trial court could have found that the most water to which Gates was *entitled,* was 105 inches in his own right and 42 inches permitted by his neighbor for a total of 147 inches; whereas the capacity of the new ditch was 217 miners inches. Gates adduced no evidence concerning the flow of water in either the old or the new

846

ditch; he merely estimated he was getting about half the usual amount of water.

The evidence adduced by Gates at the trial was insufficient to properly establish damages to a growing crop as set forth in the above citations.

Finally, Gates relies upon the provisions of I.C. § 42–1204, as construed in Mahaffey v. Carlson, 39 Idaho 162, 228 P. 793, as establishing liability on Pickett & Nelson for failing to maintain the new ditch in good repair and condition during the summer of 1964. The evidence established that at times the levee would require repair or reinforcement because of having been trampled by cows pastured in the same field through which the new ditch ran. There are two answers to this contention. First, once Pickett & Nelson had constructed the new ditch and turned it over to the Department of Highways, it had no further responsibility for the repair or maintenance of that ditch. This was recognized by Mr. Bradshaw, the resident engineer, who testified that the Highway Department itself made the necessary repairs to the ditch when required from trampling of the levee by the pastured cows. Secondly, Gates introduced no competent proof of damages sustained to his hay crop or pasturage by reason of any failure to keep the new ditch in good repair and condition as required by the statute.

The order of the trial court granting an involuntary dismissal of the action against Pickett & Nelson is affirmed. The judgment notwithstanding the verdict awarding Gates $2000 in damages against the Highway Board is reversed and the cause remanded for entry of a judgment in favor of the Highway Board and against Gates.

Costs to the Highway Board and to Pickett & Nelson on this appeal.

TAYLOR, C. J., and SMITH, McQUADE and McFADDEN, JJ., concur.