382 F.2d 714
 Jack ROBERSON and William Rodgers, Appellants,
v.
UNITED STATES of America, Appellee.
UNITED STATES of America, Appellant,
v.
MERRITT-CHAPMAN & SCOTT CORPORATION, Appellee.
MERRITT-CHAPMAN & SCOTT CORPORATION, Appellant,
v.
UNITED STATES of America, Appellee.
 Nos. 20832-20834.
 United States Court of Appeals Ninth Circuit.
 September 15, 1967.
 Rehearing Denied in No. 20832, October 26, 1962.
 
 Mark Wilmer, Charles M. Brewer, Daniel C. Olney, Herbert Mallamo, Phoenix, Ariz., for appellants Roberson & Rogers.
 Barefoot Sanders, Asst. Atty. Gen., Alan S. Rosenthal, Howard J. Kashner, Attys., Civil Division, Dept. of Justice, Washington, D. C., Richard C. Gormley, U. S. Atty., Phoenix, Ariz., for the United States.
 John H. Westover, O'Connor, Cavanagh, Anderson, Westover, Killingsworth & Beshears, Phoenix, Ariz., for Merritt-Chapman & Scott Corp.
 Before HAMLEY and DUNIWAY, Circuit Judges, and MATHES* Senior District Judge.
 HAMLEY, Circuit Judge:
 
 
 1
 Jack Roberson and William Rodgers brought this action against the United States under the Federal Tort Claims Act, 28 U.S.C. §§ 1346(b), 2671-80 (1964). They seek damages for personal injuries sustained when they fell while engaged in construction work at Glen Canyon Dam on the Colorado River, near Page, Arizona. At the time of the accident they were employees of Merritt-Chapman & Scott Corporation (MCS), an independent contractor which was building the dam under contract with the Bureau of Reclamation (Bureau) of the United States Department of the Interior.
 
 
 2
 The United States answered the complaint and filed a third-party complaint against MCS, seeking indemnification for all sums which might be recovered from the Government by the plaintiffs. MCS answered the third-party complaint. The United States thereafter obtained an order striking certain affirmative defenses set forth in that answer.
 
 
 3
 The cause went to trial before the court without a jury. At the close of plaintiffs' evidence, the United States moved for judgment in its favor. The motion was granted and the trial court entered a judgment dismissing plaintiffs' action and the Government's third-party action. All parties have appealed and the three appeals have been consolidated.
 
 
 4
 Glen Canyon Dam, rising to a height of more than five hundred feet above the bed of the Colorado River, was substantially completed when the accident occurred on April 15, 1964. The design called for a concrete-lined diversion spillway tunnel on each side of the dam. The tunnels ran from the top of the dam in a down-stream direction on a fifty-five degree incline into the river on the downstream side.
 
 
 5
 Each of the tunnels had to be cemented and grouted according to Government specifications. In order to perform this work MCS had fabricated a large scaffold, known as a "jumbo," mounted on wheels. The jumbo was designed to move up through the tunnels as the work progressed. The jumbo had several working levels, and each level was intended to be equipped with handrails, toeboards and a front guard rail. There was also to be a safety net. The jumbo was propelled up the tunnels by means of a sixton cable drum hoist situated at the top of the dam about thirty feet from the mouth of the tunnel. Essential to the operation of this hoist mechanism was an anchor pin to which the cable was attached.
 
 
 6
 Prior to the accident the cementing and grouting of the east tunnel had been completed and the jumbo was moved to the west tunnel. Work had progressed up the west tunnel to a point about 532 feet above the river bed. At this point it became necessary to take the center section out of the jumbo and bring together the top and bottom sections. Roberson and Rodgers were engaged in this work, which required them, among other things, to rest and adjust the wheels. The lower platform of the jumbo, on which they performed part of this work, was not then equipped with safety railings, toeboards or a safety net as specified in the contract, and there was nothing to which the workmen could prudently attach a safety belt.
 
 
 7
 While Roberson and Rodgers were engaged in this work on the lower platform, the jumbo suddenly slipped and the two workmen fell, sustaining the injuries for which they seek damages.
 
 
 8
 On the basis of the evidence produced during plaintiffs' case, the trial court found that the slip of the jumbo was caused either by the improper setting of the anchor pin referred to above, or by the inadequate strength of the pin. The court further found that the slipping of the jumbo and the lack of adequate guard rails or other safety appliances on the jumbo caused plaintiffs to fall and sustain the injuries in question. The court additionally found that the jumbo and anchor pin were the property of MCS, and that the United States voluntarily maintained its own safety program during the construction of Glen Canyon Dam.
 
 
 9
 The trial court concluded that the contract required MCS to exercise reasonable precautions for the safety of all employees in the performance of the contract; that, under the contract, the United States had the right of inspection to determine whether the contractor was fulfilling the terms of the contract, including compliance with safety measures, but did not have a duty to do so; that the United States was empowered, under the contract, to stop work until corrective measures had been accomplished; that the maintenance of a safety program by the United States did not constitute an abrogation of the contractual obligation of MCS to maintain its own safety program; and that because there was no duty on the part of the United States to plaintiffs, there could be no breach of duty, and thus no liability under the Federal Tort Claims Act. The judgment dismissing plaintiffs' action is based upon these findings and conclusions.
 
 
 10
 The above review of the proceedings indicates that the critical questions raised on plaintiffs' appeal relate to the circumstances under which the United States may, under the Act, become liable to the employees of the Government's independent contractor for injuries resulting from unsafe working conditions.
 
 
 11
 Under the Act, the United States may be held liable for personal injuries caused by the negligence or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, "under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred." 28 U.S.C. § 1346(b).
 
 
 12
 The accident here involved occurred in Arizona. The law of that state therefore governs in determining whether a private person, and therefore the United States, would be liable under the circumstances of this case. According to Arizona law, a cause of action founded upon negligence must be based upon a showing (1) that the defendant had a duty to protect the plaintiff from the injury of which he complains; (2) that the defendant failed to perform that duty; and (3) that such failure proximately caused the plaintiffs' injury. Shafer v. Monte Mansfield Motors, 91 Ariz. 331, 333, 372 P.2d 333. We are here concerned with the first of these three elements, the trial court holding that the United States had no duty to protect Roberson and Rodgers from the injuries of which they complain.
 
 
 13
 Roberson and Rodgers do not contend that the relationship of owner and independent contractor, as such, places a duty upon the owner, in this case the United States, to protect employees of the independent contractor from the torts of the latter, or the latter's other employees. It is the established rule that a contractee is generally not liable for the torts of his independent contractor, or of the latter's servants. See Kirk v. United States, 9 Cir., 270 F.2d 110, 116-117. Arizona likewise follows this rule. See, e. g., Throop v. F. E. Young & Co., 94 Ariz. 146, 382 P.2d 560.
 
 
 14
 However, plaintiffs advance in this court four other reasons why, in its view, the United States had a duty to protect plaintiffs from the injuries which they sustained. These reasons are as follows: (1) under the terms of the contract, the United States retained control over the safety of the work, and this gave rise to a duty to see that the jumbo was safely installed and properly rigged with safety devices; (2) under the terms of the contract, the United States retained control over the manner and performance of the pressure grouting operation, and this gave rise to the duty referred to above; (3) the particular work in which plaintiffs were engaged at the time of the accident involved an unreasonable risk of bodily harm unless special precautions were taken, and this gave rise to the described duty; and (4) the Government voluntarily assumed the duty of protecting Roberson and Rodgers from the hazards which they encountered in working on the jumbo.
 
 
 15
 In resisting the Government's motion made at the close of plaintiffs' evidence for judgment in favor of the United States, the only ground urged by plaintiffs for placing such a duty on the Government was the fourth reason referred to above. This is the so-called "Good Samaritan" doctrine.[1] The first three of the reasons listed above were advanced for the first time on this appeal, and the second of these reasons was advanced for the first time in plaintiffs' reply brief.
 
 
 16
 An appellant may not urge as a ground for reversal a theory which he did not present when the case was before the trial court. Mitford v. Prior, 9 Cir., 353 F.2d 550, 555; Dougall v. Spokane, P. & S. Ry., 9 Cir., 207 F.2d 843, 848; United States v. Waechter, 9 Cir., 195 F.2d 963, 964.[2] We therefore decline to consider the first three points referred to above.
 
 
 17
 The Good Samaritan doctrine is recognized in Arizona. Taylor v. Roosevelt Irr. Dist., 72 Ariz. 160, 232 P.2d 107, 110. The doctrine is also applicable in suits under the Federal Tort Claims Act. Indian Towing Co. v. United States, 350 U.S. 61, 69, 76 S.Ct. 122, 100 L.Ed. 48. See also Rayonier, Inc. v. United States, 352 U.S. 315, 77 S.Ct. 374, 1 L.Ed.2d 354. Insofar as here relevant, there are two aspects of that doctrine. One applies where one person undertakes to render services to another person who claims such service caused him to suffer physical harm.[3] The other applies where one person undertakes to render services to a second person and a third person claims such service caused him to suffer physical harm.[4]
 
 
 18
 Plaintiffs appear to rely primarily upon the first of these two applications of the doctrine, but we will discuss both. In order to evaluate plaintiffs' contention that one or the other of these two aspects of the Good Samaritan doctrine is applicable here and placed the Government under a duty to plaintiffs which was breached, it is necessary to consider additional facts which are not in dispute.
 
 
 19
 When the United States entered into the contract with MCS for the construction of Glen Canyon Dam, it contractually obligated MCS to provide for the safety of the workmen, and reserved the right to carry on sufficient surveillance to see that the contractor performed this obligation.
 
 
 20
 Specifically, under clause 10 of the general conditions of the specifications, the Government placed upon the contractor the obligation to exercise reasonable precautions for the safety of employees. It required MCS to comply with all applicable provisions of the Bureau's publication, "Safety Requirements for Construction by Contract."[5] Paragraph 10 further provides that the contractor shall promptly submit monthly reports of all lost-time accidents.
 
 
 21
 Under other provisions of the contract, as the trial court found, the United States reserved the right of inspection to determine whether the contractor was fulfilling the terms of the contract, including compliance with safety measures the contractor was required to take. In connection with this power to inspect, the Government reserved the right to stop the work, if necessary, until corrective measures had been taken.
 
 
 22
 Pursuant thereto, the Government set up an inspection corps and carried on a comprehensive safety inspection program. When the dam reached a height of about five hundred feet, the Government, recognizing the increased hazards, broadened its safety inspection program. A safety management officer was designated to supervise the program. According to the position description of this officer, he and two staff assistants were made responsible "for safety program execution over the dam."[6]
 
 
 23
 In the course of its safety inspection program, Government personnel inspected the rigging and installation of the jumbo. A safety inspector testified that the general rigging and weight stresses and strains to be placed on the jumbo were his responsibility, but that he "didn't recall checking this particular piece of equipment over." A week or ten days before the accident, the Government construction engineer inspected the pin to which the jumbo cable was attached, "looking for unsafe things." This official also inspected the rigging many times himself. He testified that he would not go down on the jumbo himself because it was "too dangerous." After the accident, handrails, toeboards, and other safety devices were immediately installed upon the jumbo at the direction of Government inspectors.
 
 
 24
 There were isolated instances in which Government safety inspectors gave orders directly to the contractor's workmen concerning changes needed for purposes of safety. In general, however, when the Government inspectors sought correction of an unsafe working condition they contacted the contractor's supervisory personnel, called attention to the condition and requested or demanded that changes be made.
 
 
 25
 With these facts in mind we first consider the applicability of the two-person aspect of the Good Samaritan doctrine under which one who undertakes to render services to another may become liable for physical harm suffered by the latter
 
 
 26
 As indicated in the statement of that principle set out in note 3, for any such liability to attach each of the following elements must be present: (1) the actor, in this case the Government, must undertake, gratuitously or for consideration, to render services to another, in this case plaintiffs Roberson and Rodgers; (2) the services so rendered must be of a kind which the actor should recognize as necessary for the protection of the other's person or things; (3) the actor must fail to exercise reasonable care in the performance of his undertaking; (4) the failure to exercise reasonable care must result in physical harm to the other or the other's things; and (5) the actor's failure to exercise such care must (a) increase the risk of such harm, or (b) the harm must be suffered because of the other's reliance upon the undertaking.
 
 
 27
 With reference to the first of these elements, we start with the fact that the only services rendered by the Government on which plaintiffs rely as a basis of liability are those relating to the Government's safety inspection program. There was no direct relationship between the Government and the workmen concerning the performance of these services. In the context of this case, the workmen occupied a third-person position, the Government's direct relationship being with the contractor as the second person.
 
 
 28
 In order for a case to fall under the coverage of the two-person facet of the Good Samaritan doctrine which we are now discussing, it must be shown that the purpose of the actor was to render a direct service to the person who was harmed, or to persons of that class. Thus, in illustration 1, set out under Comment c, Restatement of Torts (Second) § 323, reference is made to a case where an employer undertakes to transport an ill employee to her home and does so in a negligent manner.
 
 
 29
 Other typical instances of this kind are where the Government, without any obligation to do so, operated a lighthouse in a negligent manner, so that it failed and plaintiff's tug went aground, Indian Towing Co. v. United States, 350 U.S. 61, 76 S.Ct. 122, 100 L.Ed. 48; an employer gratuitously furnished medical aid to an employee, and was negligent in selecting a physician, Vesel v. Jardine Mining Co., 110 Mont. 82, 100 P.2d 75, 127 A.L.R. 1093; a water company gratuitously removed a meter and left the plaintiff's premises in a dangerous condition. Walsh v. Hackensack Water Co., 181 A. 422, 13 N.J.Misc. 815; a landlord gratuitously undertook to repair a water pipe and did so in a negligent manner, Tarnogurski v. Rzepski, 252 Pa. 507, 97 A. 697. In each of these instances, the actor undertook to render services for the person who was harmed, or for persons of that class.
 
 
 30
 No such direct relationship existed between the Government and the workmen at Glen Canyon Dam, at least with respect to the Government's safety activity. The Government retained the right of surveillance over the safety of the work solely for the purpose of assuring itself that MCS fulfilled its contract obligations to the United States.
 
 
 31
 That such activity did not bring into being any direct relationship between the Government and Roberson and Rodgers, giving rise to a duty to the latter to exercise reasonable care, is further indicated by what this court said in Kirk v. United States, 9 Cir., 270 F.2d 110, 116-117:
 
 
 32
 "The fact that the United States retained the right to inspect the work under construction to see that the provisions of the contract were carried out and also retained the right to stop work if they were not is not sufficient in itself to make the United States liable for damage resulting from negligence of the contractors in their performance of the contract."
 
 
 33
 We conclude that the Government did not undertake to render safety services to Roberson and Rodgers, and that the branch of the Good Samaritan doctrine based upon such a direct two-person rendition of services (§ 323 of Restatement of Torts [Second]) therefore has no application here. It is not necessary for us to consider whether the four other elements essential to establish liability under this phase of the doctrine, as outlined above, are present.
 
 
 34
 This brings us to the second aspect of the Good Samaritan doctrine, involving liability to third persons. As indicated in the statement of that principle set out in note 4, for any such liability to attach, each of the following elements must be present: (1) the actor, in this case the Government, must undertake, gratuitously or for consideration, to render services to another, in this case the contractor, MCS; (2) the services so rendered must be of a kind which the actor should recognize as necessary for the protection of third persons, in this case plaintiffs Roberson and Rodgers; (3) the actor must fail to exercise reasonable care in the performance of his undertaking; (4) the failure to exercise reasonable care in must result in physical harm to the third persons or their things; and (5) the actor's failure to exercise such care must (a) increase the risk of such harm, or (b) the undertaking must have been to perform a duty owed by the other (MCS) to the third persons (plaintiffs), or (c) the harm must be suffered because of the reliance of the other (MCS) or the third persons (plaintiffs) upon the undertaking.
 
 
 35
 As in the case of the two-person facet of the Good Samaritan doctrine, discussed above, the first essential element in establishing liability under the third-person branch of the doctrine is here missing. In conducting its safety inspection program, the Government was not undertaking to render services to the contractor. It sought only to protect its own interest, namely to assure itself that the contractor was performing in the manner required of it under the contract. The safety inspection activities of the Government did not relieve the contractor of any of its contractual duties; quite to the contrary, it was designed only to make sure that the contractor performed those duties. See United States v. Page, 10 Cir., 350 F.2d 28, 31.
 
 
 36
 The above-quoted statement from the opinion in Kirk v. United States, 9 Cir., 270 F.2d 110, 116, is as applicable with respect to liability under the third-person feature of the Good Samaritan doctrine as under the two-person aspect of the doctrine. It is true that the majority opinion in Kirk did not deal, in terms, with the Good Samaritan doctrine. However, the rule of law there announced makes it clear that no liability under that doctrine can attach where the only Governmental undertaking relied upon is a safety inspection program in connection with work being performed by an independent contractor.
 
 
 37
 Illustration 1, set out under Comment c, Restatement of Torts (Second) § 324 A, reveals the kind of circumstances which must exist before the third-person phase of the doctrine may be applied. In that illustration the operator of a grocery store calls an electric company to repair an electric light hanging over one of the aisles of the store. A workman for the electric company repairs the light in a negligent manner and it falls upon a third person, a customer, causing injuries. Since there is no question that the electric company undertook to render services for the operator of the store, and since all of the other essential elements of a third-person application of the doctrine are present, the electric company is liable to the customer.
 
 
 38
 It is true that inspection activities may, under some circumstances, give rise to liability under this aspect of the Good Samaritan doctrine. An example of this is illustration 2, set out under Comment d, Restatement of Torts (Second) § 324 A. In that illustration a person is employed by a telephone company to inspect the company's telephone poles. The inspection is done in a negligent manner as a result of which a defect is not discovered and a third person is injured. The inspector definitely undertook to render services to the company and since all of the other essential elements of a third-person application of the doctrine were present, the inspector is liable to the injured third person. Illustration 3, also set out under Comment d, is another instance in which liability to a third person may be predicated upon negligent inspection services, but again, the inspector specifically undertook to render such services for the second person.
 
 
 39
 It should be made clear that we do not ground our ruling that the Government did not undertake to render an inspection service to the contractor on the fact that the Government received no compensation for carrying on its safety inspection program. If the actor undertakes to render services for another it is immaterial whether he does so for a consideration or gratuitously. All we hold is that, under the circumstances of this case, the Government's safety inspection activities at Glen Canyon Dam did not represent performance of an undertaking, gratuitously or for consideration, to render services to the contractor.
 
 
 40
 For this reason, the third-person feature of the Good Samaritan doctrine is not applicable. We need not decide whether the other four elements essential to establish liability under this phase of the doctrine, as set out above, are present. Nor need we consider whether liability of the Government is in any event defeated by reason of the contributory negligence of Roberson and Rodgers.[7]
 
 
 41
 Affirmed on the appeal of plaintiffs. The other appeals are thereby rendered moot and are for that reason dismissed.
 
 
 
 Notes:
 
 
 *
 Senior District Judge William C. Mathes died on July 24, 1967. Before his death, he had expressed his concurrence in the result which is reached
 
 
 [1]
 This is made clear not only by the content of the argument made in the district court on behalf of plaintiffs, but by the fact that every decision cited in support of that argument is a "Good Samaritan" case. See, in addition, the following colloquy between plaintiffs' counsel and the district court:
 "THE COURT: It is sort of parallel to the Good Samaritan rule?
 "MR. WILMER: That is exactly it, your Honor; it is sometimes, I think, referred to as the Good Samaritan rule.
 * * * * *
 "The situation, if the Court please, is squarely within the Good Samaritan rule. At least, there is certainly sufficient evidence in this record to support a finding clearly that the Government undertook from the outset the business of supervision.
 * * * * *
 "Unless your Honor would conclude that the Good Samaritan rule is not applicable, we submit that at this point the record fairly shows that the Government did undertake the task of supervising safety, and having undertaken that task, it is Hornbook tort law that they must do so with due care.
 * * * * *
 "THE COURT: As I understand Mr. Wilmer's position, and he may correct me if I am wrong, it is that assuming there was no duty on the part of the United States to conduct any kind of safety inspection program, or anything of that nature, once they undertook to conduct such a safety program, his position is that they failed to conduct it properly and that failure resulted proximately in the injuries to the plaintiffs, whether it be through the pin or the lack of a guardrail.
 * * * * *
 "THE COURT: Did I misunderstand you in my statement?
 "MR. WILMER: No, that is exactly correct, your Honor."
 
 
 [2]
 An exception is sometimes made where consideration of the new theory is necessary to prevent a manifest miscarriage of justice in a case involving personal liberty. Miller v. Gladden, 9 Cir., 341 F.2d 972, 975
 
 
 [3]
 TheTaylor case represents an application of this two-party facet of the Good Samaritan doctrine. This branch of the doctrine is stated as follows in Restatement of Torts (Second):
 "§ 323. Negligent Performance of Undertaking to Render Services
 "One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of the other's person or things, is subject to liability to the other for physical harm resulting from his failure to exercise reasonable care to perform his undertaking, if
 "(a) his failure to exercise such care increases the risk of such harm, or
 "(b) the harm is suffered because of the other's reliance upon the undertaking."
 
 
 [4]
 There appears to be no Arizona statute or court decision dealing with this three-party aspect of the doctrine. However, the Arizona courts follow the Restatement of the Law of Torts on matters not covered by statute or an earlier judicial decision. MacNeil v. Perkins, 84 Ariz. 74, 324 P.2d 211, 215; Serrano v. Kenneth A. Ethridge Contracting Co., 2 Ariz.App. 473, 409 P.2d 757, 760. This feature of the Good Samaritan doctrine is stated as follows in Restatement of Torts (Second):
 "§ 324A. Liability to Third Person for Negligent Performance of Undertaking
 "One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of a third person or his things, is subject to liability to the third person for physical harm resulting from his failure to exercise reasonable care to protect his undertaking, if
 "(a) his failure to exercise reasonable care increases the risk of such harm, or
 "(b) he has undertaken to perform a duty owed by the other to the third person, or
 "(c) the harm is suffered because of reliance of the other or the third person upon the undertaking."
 
 
 [5]
 This publication requires each contractor to demonstrate that he has facilities for conducting a safety program commensurate with the work under construction. Specific safety organizational requirements are set forth, including the establishment of a joint safety policy committee and the designation by the contractor of a competent supervisory employee effectively to carry out the health and safety program. Each contractor is required to conduct safety meetings and safety and first-aid training programs, to make safety reports and to maintain safety records. The publication further requires each contractor to provide safety belts and nets for workmen employed on steep slopes or other places where there is danger of a serious fall. Before any machinery or mechanized equipment is put into use, each contractor is obliged to inspect and test it to determine if it is in safe operating condition. Handholds, guard rails and toeboards must be provided by each contractor, as necessary, to assure safe footing and accessways. Such safeguards are specifically required on runways, ramps, platforms and scaffolds six feet or more in height above the adjoining surface
 
 
 [6]
 Among the duties placed upon them was that of developing and maintaining on a current basis:
 "* * * a safety program devised to provide constant surveillance of hazardous construction activities and to ascertain that safety rules, regulations and practices are observed by both Bureau and contractor employees."
 They were also expected to insist on compliance with the provisions of the Bureau's Handbook, "Safety Requirements for Construction by Contract," and to take "corrective measures to prevent recurrence of violations." In addition, they were to analyze the cause of accidents not resulting from violations and recommend "to supervisor changes in work procedures or adoption of supplemental safety requirements to prevent reoccurrences."
 
 
 [7]
 The second paragraph of the trial courts' Conclusions of Law No. VI, reads as follows:
 "Because of Findings of Fact as herein set forth and the conclusions of law herein set forth, this Court does not conclude it necessary that it determine the question of the possible contributory negligence of the plaintiffs, and each of them. Were this Court to find it necessary to reach a conclusion in this respect, it would conclude that the evidence adduced at the trial disclosed that the plaintiffs, and each of them, were two experienced iron workers and were guilty of contributory negligence in working on the Jumbo, without the use of safety belts which were ready and available for their use, knowing that the Jumbo was to be moved."