Leo F. **BAUM**, Plaintiff-Appellant,

v.

**UNITED STATES of America,**
**Defendant-Third-Party**
**Plaintiff-Appellee,**

v.

**JACKSONVILLE SHIPYARDS, INC.,**
**Third-Party Defendant-Appellee.**

No. 28615.

United States Court of Appeals,
Fifth Circuit.

June 2, 1970.

George J. O'Neill, Seymour I. Toll, Philadelphia, Pa., Evans & Stewart, Tom B. Stewart, Jr., Jacksonville, Fla., for appellant.

John L. Briggs, U. S. Atty., Jacksonville, Fla., Thomas J. Boyle, Admiralty & Shipping Section, Ralph A. Fine, Atty., Morton Hollander, Chief, Appellate Section, U. S. Dept. of Justice, Washington, D. C., for the United States.

Charles Cook Howell, III, Jacksonville, Fla., for Jacksonville Shipyards Inc.

Before GODBOLD, DYER and MORGAN, Circuit Judges.

LEWIS R. MORGAN, Circuit Judge:

This is a civil action in admiralty jurisdiction brought under the Suits in Admiralty Act, as amended, 46 U.S.C. §

741 et seq., and the Public Vessels Act, as amended, 46 U.S.C. § 781 et seq. The plaintiff was injured while working on board the drydocked vessel, the SS CAPE SAN MARTIN, which is a steam-screw vessel owned by the defendant, United States of America (hereinafter the Government), and which was undergoing a reactivation overhaul in Jacksonville, Florida, pursuant to a contract between the Government and Jacksonville Shipyards, Inc. (hereinafter Jacksonville). The Government impleaded Jacksonville under Rule 14(c), Federal Rules of Civil Procedure, presumably on the theory that the liability of the Government, if any, was occasioned by Jacksonville's breach of its warranty of workmanlike service. The District Court, Middle District of Florida, made Findings of Fact and Conclusions of Law and entered judgment in favor of the Government against the plaintiff dismissing the action, and in favor of the Government against Jacksonville for attorney's fees expended in the defense of this claim.

As far as this appeal is concerned, we need not determine whether or not Jacksonville has standing to join in this appeal under Rule 14(c), F.R.C.P., as its assertion is that we affirm the entire judgment below, which position is consonant with that of the Government. Neither its brief nor its oral argument have raised any new issues or defenses.

They only repeat additional factual circumstances going to the question of whether, assuming a duty of care owed by the Government to the plaintiff, there was a breach of that duty. This is an alternative argument which we need not reach to decide this case. Thus, Jacksonville's presentations are of no consequence.

The Government entered into a "Master Lump Sum Repair Contract"[1] with Jacksonville for the repair and reactivation of the Government vessel, the SS CAPE SAN MARTIN, which had been in the "moth-ball fleet" in the Hudson River. The vessel had been towed to Jacksonville's yards after the latter had been successful in its bid for the contract. In accordance with paragraph(c) of Article 4 of the contract, one Springs, a marine inspector, was placed on board the vessel, and he remained aboard during the entire period of repair. Aside from the rights and duties provided him in the contract (note 1), Springs' duties were approval and rejection of materials furnished under the terms of the contract; determination of need for change orders; certification of satisfactory completion of work and generally ensuring that Jacksonville complied with the contract at a minimum cost to the Government. The vessel was completely drydocked at the time of the accident and not have motive power of its own. The

---

1. The pertinent part of which reads:
     ARTICLE 4. *Workmanship and Inspection:*
     (a) Unless otherwise specifically provided in the job order all workmanship, equipment, materials and articles, and all operational practices of the Contractor used in the performance of the work, shall be the best commercial marine practice and shall be of a suitable grade of their respective kinds. All work performed by the Contractor shall comply with the requirements of the American Bureau of Shipping, the United States Coast Guard, and other regulatory bodies in accordance with the rules of said regulatory bodies.
     (c) During the Contractor's performance thereof, the work shall be subject to inspection and test by the authorized

representative of the [Director, National Shipping] Authority at any and all times and places, and any part of the work may be rejected by said representative of the Authority if not as specified or because of defective workmanship or materials. Any portion of the work so rejected shall forthwith be replaced or corrected by the Contractor at its own cost and expense.
     (f) At the request of the authorized representative of the [Director, National Shipping] Authority the Contractor shall place reasonable safeguards and shall put and keep at all time sufficient lights to prevent accidents in spaces and areas in which the Contractor will be required to perform or has started work and to provide safe access and egress to and from the vessel.

Government retained title, but Jacksonville had complete custody.[2]

The plaintiff was an employee of Jacksonville and was assigned by his supervisor to remove the valves of an evaporator in the engine room under the ship's deck. Already working in that same area was a clean-up crew which was engaged in removing debris from the engine room. The debris was placed into a five-gallon paint bucket, then hoisted by means of a block and tackle to a landing some 15 to 18 feet above plaintiff. There was testimony from the plaintiff and from workers on the clean-up crew that such use of paint buckets was "the usual way," and that it was safe as long as the bucket was not overloaded. On this occasion, the bucket was not overloaded (it was "only half filled", weighing ten to twenty pounds, whereas when filled with paint, it weighs fifty pounds). It had been hoisted about fifteen feet when the handle pulled out from one side and the bucket fell on plaintiff's head causing injury.

■ Plaintiff's sole contention is that the Government owed a duty to plaintiff to exercise due care to provide a reasonably safe place to work. Plaintiff does not contend that this duty is based on the Good Samaritan rule (i.e., that by its affirmative acts, the Government undertook to provide safety measures for the protection of Jacksonville's employees, which undertaking was relied upon by Jacksonville, and which was negligently carried out resulting in injury. Roberson v. United States, 9 Cir., 1967, 382 F.2d 714). Nor does the plaintiff rely on the warranty of seaworthiness, recognizing that there is no such warranty where the vessel is withdrawn from navigation, is in drydock for repair, is without a crew and motive power, and is unequipped for sailing. West v. United States, 361 U.S. 118, 80 S.Ct. 189, 4 L.Ed.2d 161 (1959); Moye v. Sioux City

& New Orleans Barge Lines, Inc., 5 Cir., 1968, 402 F.2d 238, cert. den. 395 U.S. 913, 89 S.Ct. 1759, 23 L.Ed.2d 226 (1969), reh. den. 395 U.S. 987, 89 S.Ct. 2141, 23 L.Ed.2d 777 (1969).

Instead, the plaintiff argues that the duty is derived from the combination of two factors: (1) the Government's ownership of the vessel and (2) the obligations created under the provisions in the contract (see note 1). The District Court rejected this contention, citing Roberson, supra, for the proposition that "the rights of an employee of an independent contractor with respect to the United States are not expanded by rights of inspection afforded to the United States by provisions in the contract between the United States and the injured party's employer." The plaintiff contends that Roberson is not applicable to the case at bar and that the misapplication by the District Court was reversible error.

The plaintiff is correct in his assertion that the Roberson decision does not squarely answer the questions presented in the case at bar. The Roberson case held that the Government would not be subject to the Good Samaritan rule under the particular facts in that case. The Good Samaritan rule is a grounds for imposing a duty on the Government distinct from the grounds upon which the plaintiff here relies. However, there are many other cases, some cited in Roberson, which do not rely on the Good Samaritan rule, and which hold that the Govenment's retention of the right to inspect the work under construction to see that the provisions of the contract are carried out is not sufficient, in itself, to impose a duty on the Government, the breach of which will give rise to liability to injured employees of the contractor. United States v. Page, 10 Cir., 1965, 350 F.2d 28; Kirk v. United States, 9 Cir., 1959, 270 F.2d 110; Filipek v. Moore-McCormack, Inc., 2 Cir., 1958, 258 F.2d 734; Gal-

2. The Contract provided:
   ARTICLE 5. *Drydocking and Berthing*
   (a) On entering and leaving a yard, pier, drydock or marine railway, the Contractor shall have charge of and be responsible for the vessel within the limitations of this contract from the time the Contractor's lines are secured to the vessel until such time as all of the Contractor's lines are cast off.

lagher v. United States, 2 Cir., 1953, 206 F.2d 177. See also Hodge v. United States, M.D.Ga., 1969, 310 F.Supp. 1090 [1969], aff'd. 424 F.2d 545. The District Court's statement merely reiterates this established rule, which is repeated in a different context in *Roberson*. It was not reversible error.

The real question posed by the plaintiff is under what circumstances will the Government be found to have a duty toward employees of independent contractors working under government contracts. Plaintiff contends that the circumstances here give rise to the imposition of such a duty. We do not agree. In reaching this conclusion, the following relevant factors are considered, seriatim: what law is applicable; the relationship between the parties; the terms of the contract; the acts of the parties regardless of the contract; who had control of the vessel, the work area, and the safety program; the nature of the risk involved; and when was the risk created.

While this action is brought under the Suits in Admiralty Act, supra, and the Public Vessels Act, supra, and their concomitant admiralty law, in this case we find no duty imposed thereunder any different from the duty imposed on other owners of property. Since the plaintiff is not invoking the seaworthiness warranty, the fact that the property owned by the Government here is a sea-going vessel does not differentiate this case from similar cases arising under the Federal Tort Claims Act, 28 U.S.C. 1346 (b). See e.g., *Kirk*, supra (federal dam project); Market Ins. Co. v. Killon, 5 Cir., 1969, 415 F.2d 459 [1969] (federal lake project); *Hodge*, supra (airplane hangar on U. S. Air Force base).

Nor does the relationship between the parties here (contractee-contractor) give rise to the imposition of a duty on the Government. It is well settled "that a contractee is generally not liable for the torts of an independent contractor or of the latter's servants". *Roberson*, supra; *Kirk*, supra; 41 Am.Jur.2d, Independent Contractors, § 24 (1968).[3]

Nor do we find that the terms of the contract impose a duty on the Government. Paragraph (f) (note 1) specifically states that the *Contractor* was to place reasonable safeguards and provide adequate lighting to protect its employees. It is unreasonable to believe that the contractor was relying on the government inspector to suggest alternative methods of raising debris from the engine room. This plainly was not part of his duties, either under the terms of the contract or by tacit understanding. The inspector's duties in this case were broader, and more in the order of an overseer of acquisitions, costs and compliance with specifications. Placing upon the Government the responsibilities of carelessness on the part of the employees of its contractors in their day to day work procedures would certainly be good news to government contractors, but it would also be a gross misinterpretation of the intention of the contracting parties.

Perhaps the decisive factor involved here is who had control of the vessel, the work area, and the safety precautions. In *West*, supra, the Supreme Court stressed the importance of this factor when it said:

> * * * it [would be] manifestly unfair to apply the requirement of a safe place to work to the shipowner when he has no control over the ship or the repairs, and the work of repair in effect creates the danger which makes the place unsafe. (361 U.S. at 123, 80 S.Ct. at 193).

The *West* case, which plaintiff strongly argues does not lend support to the Government's case, dealt with an injury to the employee of an independent contractor working on a dry-docked vessel. The injury there was caused by a plug flying

---

3. An exception to this general rule arises, of course, when the contractor has knowledge of a dangerous condition created by the independent contractor. Emelwon, Inc. v. United States, 5 Cir., 1968, 391 F.2d 9. However, there is no evidence here that the government inspector had knowledge of any dangerous defect.

off the end of a pipe near which the plaintiff was working, when a fellow worker turned on the water pressure. The plaintiff cites the cases of Stark v. United States, 5 Cir., 1969, 413 F.2d 253, and Van Horn v. Gulf Atlantic Towing Corp., 4 Cir., 1968, 388 F.2d 636, for the rule that *West* is limited to "instances in which the repair work created the unsafe condition." He would have us distinguish the injury in *West* from the present one on the grounds that it emanated from the very object which was to be repaired, whereas here the injury emanated from a work operation in the vicinity where plaintiff was working. We cannot say that cleaning out pipes is more or less hazardous than working in a room where a clean-up crew is removing debris. Both involve a certain amount of risk. Whether the actual injury is caused by the object being repaired or by other work being done in the vicinity is not cause for distinction where the risk is equally present in both situations. In both, the repair work creates the unsafe condition.

Thus, where the Government is not in control of the incident which created the risk (as in *West* and as in the case at bar), and where the risk is not a latent one created prior to the Government's loss of control (*Van Horn*, supra; White v. United States, 4 Cir., 1968, 400 F.2d 74) nor an inherently dangerous one wherein the shipowner requires the work to be done in a manner inherently dangerous to human safety (Halecki v. United New York and New Jersey Sandy Hook Pilots Assn., 2 Cir., 1962, 302 F.2d 840) then it would be "manifestly unfair" to impose on the Government a duty to provide safety measures for employees of the contractor.

The record indicates that the Government had relinquished control of the vessel. The Government was not in control of the work area, the manner of detail performance, nor safety procedures, and it was not a duty of the single inspector on board to take control of same. In fact, there is here much less possibility of control by the Government than in *West*, supra, where the Government had placed six inspectors aboard the drydocked vessel.

Therefore, we find that this case is controlled by *West*, supra, and *Moye*, supra, and we affirm.

Affirmed.