**Antonio RAMOS PEREZ et al.,**
**Plaintiffs, Appellants,**

**v.**

**UNITED STATES of America et al.,**
**Defendants, Appellees.**

**No. 78–1107.**

United States Court of Appeals,
First Circuit.

Argued Nov. 8, 1978.

Decided March 15, 1979.

282

Harvey B. Nachman, Santurce, P.R., for plaintiffs, appellants.

Morton Hollander, Atty., Dept. of Justice, Washington, D.C., with whom Julio Morales-Sanchez, U. S. Atty., San Juan, P.R., Barbara Allen Babcock, Asst. Atty. Gen., Leonard Schaitman and Michael Kimmel, Attys., Civ. Div., App. Staff, Dept. of Justice, Washington, D.C., on brief, for defendants, appellees.

Before COFFIN, Chief Judge, CAMPBELL and BOWNES, Circuit Judges.

LEVIN H. CAMPBELL, Circuit Judge.

On February 21, 1974, Nancy Ramos De Jesus sustained severe injuries when she fell from the balcony of her parents' third-floor apartment in Llorens Torres, a San Juan housing project owned and operated by the Corporacion de Renovacion Urbana Y Vivienda (CRUV), a Puerto Rican public housing authority. The Llorens Torres project had been built between 1950 and 1954 by the Municipal Housing Authority of San Juan, a predecessor of CRUV, with funds provided under the United States Housing Act of 1937, Pub.L. No. 412, 50 Stat. 888 (current version at 42 U.S.C. §§ 1437–40), by the Public Housing Administration (PHA), a predecessor of the United States Department of Housing and Urban Development (HUD).[1] Alleging that the railing of the balcony from which Nancy Ramos fell was dangerously low, the plaintiffs sued the United States, CRUV, and CRUV's insurer, the Commonwealth Insurance Company (CIC), under the Federal Tort Claims Act, 28 U.S.C. §§ 1346, 2671–80, in the federal district court of Puerto Rico.

It was alleged in the complaint[2] that the "designing, construction, supervision, control and approval and financing" of the housing project was carried out by the United States, CRUV and CIC "in a negligent manner, as the height of the balcony rails [in Llorens Torres] does not comply with the minimum standard safety regulations of neither the Federal government nor the Commonwealth of Puerto Rico . . ." Recovery from the United States was sought on the basis that HUD "provided financing" for the project, "reviewed the project plans and specifications . . . and sent an inspector to make periodic inspections . . . ." Later plaintiffs advanced the additional theory, that United States employees had required the raising of part of the balcony floor in the plaintiffs' apartment, that this may have led to raising the entire floor, and that the end result was to reduce the height of the balcony railings from four feet to 37.5 inches.

■ To recover against the United States under the Federal Tort Claims Act, the plaintiffs had to show that Nancy Ramos' fall was due to the "negligent or wrongful act or omission" of an "employee of the [Federal] Government." 28 U.S.C. § 1346(b). This had to be done either by showing negligence on the part of employees of HUD or by establishing that CRUV was in fact, if not in name, a federal agency and that *its* employees had been negligent. *See* 28 U.S.C. § 2671. The United States took the position that plaintiffs could establish neither that HUD employees had been negligent nor that CRUV was a federal agency, and moved to dismiss. Fed.R.Civ.P. 12(b)(6).

Treating the government's motion as a motion for summary judgment, Fed.R. Civ.P. 56, the district court held that CRUV was not a federal agency and that the United States therefore was not liable for any negligence on the part of its employees in constructing and maintaining the Llorens Torres project. It also held that the United States could not be liable as a principal for Nancy Ramos' injuries because, under Puerto Rican law, no liability could arise from constructing a balcony with a 37.5 inch railing. It concluded that it could "perceive of no fact pattern which would entitle Plaintiff to recovery under the Federal Tort Claims Act," and that any doubts as to the facts were immaterial. As there were no independent grounds for federal jurisdiction over CRUV and CIC, the action as to all three parties was dismissed.[3]

1. As a matter of convenience, we will refer to CRUV and its predecessor as CRUV, and to PHA and HUD as HUD.

2. We refer here to plaintiffs' Third Amended Complaint of April 6, 1976.

3. In its February decision, the court dismissed the action as to CRUV, apparently overlooking CRUV's insurer, the Commonwealth Insurance Company (CIC). As we lacked jurisdiction if the action as to CIC was still pending, Fed.R. Civ.P. 54(b), we asked the district court to clarify its disposition of the case. On January

Plaintiffs' assignments of error on appeal are not clearly formulated but are best characterized as follows: They say that there are "genuine issues of material fact" as to whether CRUV was in fact a government agency. Alternatively, they argue that there are facts from which a court, on one of several theories, might find that HUD's own employees were directly at fault with respect to the alleged balcony defect.

## I. Liability for acts of CRUV

The district court was correct in holding that CRUV, on the facts presented, was not a federal agency within the meaning of the Federal Tort Claims Act. The court properly relied on three Supreme Court decisions, United States v. Orleans, 425 U.S. 807, 96 S.Ct. 1971, 48 L.Ed.2d 390 (1976), Logue v. United States, 412 U.S. 521, 93 S.Ct. 2215, 37 L.Ed.2d 121 (1973), and Maryland v. United States, 381 U.S. 41, 85 S.Ct. 1293, 14 L.Ed.2d 205 (1965). Under these cases, whether a government contractor is a federal agency is determined by "the power of the Federal Government 'to control the detailed physical performance of the contractor'", Orleans, 425 U.S. at 814, 96 S.Ct. at 1976, citing Logue, 412 U.S. at 528, 93 S.Ct. 2215. The issue, "is not whether the [alleged tortfeasor] receives federal money and must comply with federal standards and regulations, but whether its day-to-day operations are supervised by the Federal Government." Orleans, 425 U.S. at 815, 96 S.Ct. at 1976.

In Maryland, a member of the Maryland National Guard who received his pay from the United States and had to meet federal requirements was held not to be a United States employee, in part because state authorities appointed and exercised immediate control over him.[4] 381 U.S. at 48–49, 85 S.Ct. 1293. In Logue, the United States was exonerated from liability for the negligence of a county jail in caring for a federal prisoner. The jail was required to meet federal standards of treatment, and the United States had "'the right to enter the institution . . . at reasonable hours for the purpose of inspecting the same and determining the conditions under which federal offenders are housed.'" But, as the United States had "no authority to physically supervise the conduct of the jail's employees," 412 U.S. at 530, 93 S.Ct. at 2220, the jailkeeper was not a federal employee.[5] Finally, in Orleans the Court held that the United States was not liable for the alleged negligence of employees of a community action agency funded by the United States Officer of Economic Opportunity (OEO) pursuant to the Economic Opportunity Act of 1964, 42 U.S.C. §§ 2781–2837 (EOA). The agency had been created to carry out the community action programs of the EOA, it received funds exclusively from the OEO, it "conducted only programs 'formulated and funded by the federal government,'" and it and its activities were closely supervised by the OEO. 425 U.S. at 811, 96 S.Ct. at 1974. It was required to "comply with extensive regulations which include employment policies and procedures . . . accounting and inspection procedures, expenditure limitations, and programmatic limitations and application procedures. . . ." 425 U.S. at 817–18, 96 S.Ct. at 1977.[6] Nevertheless, the federal funding was given in response to private initiatives and left control of the community action

---

17, 1979, it dismissed the action as to CIC nunc pro tunc.

4. This result was also determined by an analysis of federal statutes establishing the National Guard and of Defense Department practice, and by the fact that Congress had established an administrative procedure for handling tort claims based on actions by National Guard personnel. See 381 U.S. at 52–53, 85 S.Ct. 1293.

5. The Court remanded, however, for consideration of whether the deputy marshall, concededly a federal employee, had been negligent himself, in failing to order that the prisoner be kept under constant surveillance or otherwise. 412 U.S. at 532–33, 93 S.Ct. 2215.

6. Federal supervision was sufficiently close that federal funding was suspended at one point until the agency was reorganized and a new Chairman appointed. 425 U.S. at 811, 96 S.Ct. 1971.

agencies in private, local hands. 425 U.S. at 817, 96 S.Ct. 1971. The Court said that neither establishing guidelines nor supplying federal aid, advice and oversight in order to ensure that federal funds are not "diverted to unauthorized purposes" gives the government the "day-to-day control" over funded organizations that is a prerequisite to its liability under the Federal Tort Claims Act. 425 U.S. at 818, 96 S.Ct. 1971.

■ Viewed in light of these principles, the record before us indicates that the United States cannot be liable for the negligence—if any—of CRUV. The information as to HUD's control over CRUV showed only that HUD, like OEO, was a financier with particular goals that recipients of its funds were expected to share, and that CRUV, although required to meet certain federal specifications, was fully responsible for the design and construction of the project. It was CRUV who proposed and requested financing for Llorens Torres. It and HUD's Puerto Rican office then agreed to a development program, which established the cost and basic design of the project in accordance with minimum federal standards. After this was approved by Washington, they signed an Annual Contributions Contract. Although this contract contained provisions covering the construction and eventual management of the project, it was primarily a financing agreement.[7] It required CRUV to hire qualified architects and engineers to design and supervise construction of the project, and to include certain employment benefits in its contracts with its construction crews. After the project's completion, CRUV was to be responsible for its maintenance, and was to repair any parts that became unsafe or unsanitary.

The Annual Contributions Contract gave HUD the right to review "all work, materials, pay rolls, records of personnel, conditions of employment, and other relevant data and records," and to "inspect, to the extent it deems necessary, the construction work and equipment in order to check compliance with the construction contracts . . . and this Contract." HUD was to inform CRUV of any noncompliances it observed, but was not to deal directly with any of CRUV's contractors. HUD monitored and inspected the project to ensure that it was built according to specifications, that federal funds were not misused, and that it did not exceed its budget. It reserved the right to enter and repair the project if the local authorities failed to do so.

The Annual Contributions Contract did not go beyond ensuring that public housing funds would be used for their intended purpose and would not be spent wastefully or diverted to other ends. The provisions dealing with the construction and maintenance of the project were no more than additional insurance that it would be completed and would remain viable.[8] It was CRUV who designed, built, and managed Llorens Torres. HUD's only contractual agreement was with CRUV, and it had no direct contact with or supervision over CRUV's architects or contractors. This arrangement is comparable to those in *Orleans, Logue* and *Maryland*, where federal funding and federal specifications were also present, and where direct supervision over the employees of the funded organization was also lacking.

■ The plaintiffs argue that a material issue as to the government's control was created by the deposition testimony of Mr. Servaites, a former HUD employee who had been with HUD's Puerto Rican office when Llorens Torres was built. Mr. Servaites testified that a government inspector was present at Llorens Torres "all the time." This would appear to conflict with the

---

7. As the original contract, which apparently was entered in 1950, could not be located, a facsimile copy of HUD's standard 1950 contract was included in the record. So too, apparently, was a copy of a 1952 contract between CRUV and HUD that superseded any prior contract(s) between them. *See* note 9, *infra.*

8. Unlike the plaintiffs, we feel that HUD's reserved right to enter and repair supports rather than contradicts this conclusion. This kind of provision typically is included in financing agreements to protect a mortgagee's or financier's interests.

government's position, reflected in its answer to the plaintiffs' interrogatories, that only bi-weekly inspections of the project were conducted. Considering the evidence as a whole, however, we feel that this discrepancy does not create a "genuine issue as to any material fact" sufficient to preclude the use of summary judgment. Fed.R. Civ.P. 56(c). The inspector's function at the site under either version was to protect HUD's financial interests and the integrity of the public housing program. The on-site inspector was not responsible for supervising the architects or construction crews; indeed, he was prohibited by contract from dealing with them directly. Nor was he responsible for the plans for Llorens Torres, which had been drafted by CRUV architects and approved by HUD on meeting federal specifications. Thus whether he was there "all the time" or only intermittently is not determinative of whether HUD had such close, detailed, day-to-day supervision and control over CRUV that CRUV should be considered a federal agency.[9]

## II. *Negligence on the part of HUD*

As the plaintiffs cannot recover from the United States for any negligence on the part of CRUV, they must rely on their second theory of recovery: that HUD and its employees were themselves negligent. *See Logue*, 412 U.S. at 532–33, 93 S.Ct. 2215. The court below excluded this possibility on the ground that no liability could arise from designing a 37.5 inch high balcony railing. Both parties take the position that whether the balcony was negligently designed was not before the court. The plaintiffs argue, in addition, that HUD's employees,

"were responsible for changes in the height of the balcony parapets, . . . approved the plans and specifications for the deviations and . . . failed to inspect according to their own standards,"

and that HUD was,

"concerned with the safe, decent and sanitary conditions of its ultimate tenants. It exercised control over projects . . . and under the law was granting a warranty of habitability. It, through its own employees, and through its meticulous day-to-day supervision of the employees of contractors, breached its duty."

They argue that there was sufficient evidence of this in the record to create a "genuine issue of fact," and that summary judgment was therefore improper. The United States, on the other hand, insists that the record contains no evidence of negligence on its part and asks us to affirm, although for reasons other than those provided by the district court.

For plaintiffs to prevail on the theory that HUD's own employees acted negligently, they must establish that the alleged defect in the balcony resulted from the breach of a duty owed by HUD to the tenants of Llorens Torres within the contours of Puerto Rican law. *See Zabala Clemente v. United States*, 567 F.2d 1140, 1143 (1st Cir. 1977), *cert. denied*, 435 U.S. 1006, 98 S.Ct. 1876, 56 L.Ed.2d 388 (1978).[10] The plaintiffs suggest that HUD had two duties, either of which, if violated, would allow them to recover. First, alluding to HUD's contractual right to review and approve the plans for Llorens Torres and to inspect the site, they suggest that HUD had an affirmative duty to ensure that Llorens

---

**9.** Plaintiffs, asserting that the 1950 facsimile Annual Contributions Contract produced by the government evidenced the requisite degree of HUD control over CRUV, also allege that the district court erroneously relied instead on a 1952 Annual Contributions Contract between CRUV and HUD. The 1952 version was attached to papers submitted to the district court by the government, and is included in a Supplemental Appendix filed with this court on appeal. We are not sure of the accuracy of this

allegation and, in any event, it is of little consequence. Plaintiffs do not point to any significant differences between the two contracts.

**10.** As this court has noted recently, Puerto Rican law does not depart from typical common law tort principles, which impose liability only where there is a duty owed to the plaintiff. *Zabala Clemente v. United States*, 567 F.2d 1140, 1143 (1st Cir. 1977), *cert. denied*, 435 U.S. 1006, 98 S.Ct. 1876, 56 L.Ed.2d 388 (1978).

Torres was safe. Thus they say that HUD "failed to inspect according to [its] own standards." Second, they theorize that HUD caused the railing of the Ramos' balcony to be changed to an unsafe height. They argue that, if this fact could be established, then the United States could be liable for damages resulting from HUD's acts, presumably on the ground that HUD had a duty not to increase the risk of harm to the tenants. *See Zabala Clemente,* 567 F.2d at 1145.

■ Turning to the first theory, we find no basis for holding that HUD was under an affirmative duty to ensure that Llorens Torres was safe. The United States neither owned nor was in possession of the Llorens Torres site and thus could not have owed any duties to the project's tenants as a landowner. *See Fisher v. United States,* 441 F.2d 1288, 1291 (3d Cir. 1971); W. Prosser, Law of Torts § 63 (4th ed. 1971). HUD was a financier with rights to review the plans for Llorens Torres and to inspect the site. Neither of these rights, however, burdened it with an affirmative duty to guarantee the safety of the project's tenants.

■ There is no basis for imposing affirmative obligations on HUD merely because it reviewed the designs for Llorens Torres. Plaintiffs have not pointed to any legal doctrine under which HUD was required to establish safety standards for the projects it funded, and we can think of

none.[11] Thus we attach no great significance to the fact that there apparently were no federal standards for balcony railings when Llorens Torres was built. More importantly, like the FAA safety inspection procedures at issue in *Zabala Clemente, supra* (1st Cir.), 567 F.2d 1140, whatever federal standards did exist were, in our view, established for the benefit of HUD, as guidelines to HUD's employees and as a means of ensuring that federal housing funds would be spent for their intended purpose. Tenants inevitably would benefit from the construction of housing in compliance with federal specifications, but the adoption of such standards cannot be said to have created duties owed to the general public. *See id.* at 1144–46; *Kirk v. United States,* 270 F.2d 110, 117 (9th Cir. 1959).

■ Nor did HUD's right to inspect the site give rise to a duty to ensure the safety of the project's tenants. HUD's interest in inspecting was to guarantee compliance with the applicable contracts; its employees were not conducting general safety inspections, but rather were at the site to ensure that the project was built according to plans and to protect HUD's financial interests. HUD did not agree to inspect as a service to CRUV or to CRUV's tenants, and hence did not undertake to fulfill CRUV's duties to future tenants, *see Roberson v. United States,* 9th Cir., 382 F.2d 714, at 721. As HUD merely reserved the right to in-

11. At several places in their brief plaintiffs make reference to the fact that HUD was "concerned" with providing "decent, safe and sanitary" housing for the poor. This expression— "decent, safe and sanitary"—was used by Mr. Servaites in his deposition and also appeared in the United States Housing Act of 1937, Pub. L.No. 412, 50 Stat. 888 (current version at 42 U.S.C. §§ 1437–40). The Act declared it to be the "policy" of the United States to "assist" the states in remedying unsafe and unsanitary housing conditions and the "shortage of decent, safe and sanitary dwellings." Pub.L.No. 412, § 1; *see* 42 U.S.C. § 1437. We do not understand the plaintiffs to go so far as to suggest that this statutory expression of policy and intent to assist the states imposed an affirmative duty on HUD to guarantee that all HUD-financed housing would be safe. Such an argument would be frivolous, as a plain reading of

the relevant provisions reveals. The low-income housing program vests control over the design, construction and maintenance of federally-funded projects with local housing authorities, *e. g.,* 42 U.S.C. §§ 1437, 1437b(a), 1440, and Congress has given no indication that in creating this program it intended to burden HUD with a statutory duty, enforceable at the suit of individual tenants, to ensure that all HUD-funded housing was hazard-free. *Accord, Alexander v. Department of Housing and Urban Development,* 555 F.2d 166, 171 (7th Cir. 1977), *cert. granted on other grounds,* 437 U.S. 903, 98 S.Ct. 3087, 57 L.Ed.2d 1132 (1978); *Boston Public Housing Tenants' Policy Council, Inc. v. Lynn,* 388 F.Supp. 493, 495–96 (D. Mass. 1974); *cf. Kirk v. United States,* 270 F.2d 110, 117 (9th Cir. 1959) (no duty established by mere provision to secure public safety or welfare).

spect without more, it did not incur any duties to CRUV—much less CRUV's tenants—to discover any problems with the Llorens Torres construction. *See Zabala Clemente*, 567 F.2d at 1145, 1148–49; *Fisher*, 441 F.2d at 1291; *Gowdy v. United States*, 412 F.2d 525 (6th Cir.), *cert. denied*, 396 U.S. 960, 90 S.Ct. 437, 24 L.Ed.2d 425 (1969); *Wright v. United States*, 404 F.2d 244, 247 (7th Cir. 1968); *Roberson v. United States*, 382 F.2d 714, 721 (9th Cir. 1967); *United States v. Page*, 350 F.2d 28, 30–31 (10th Cir. 1965), *cert. denied*, 382 U.S. 979, 86 S.Ct. 552, 15 L.Ed.2d 470 (1966); *see also Gercey v. United States*, 540 F.2d 536 (1st Cir. 1976). Individuals deciding to move into Llorens Torres could not have reasonably relied on the fact that the United States might have inspected it. *See Zabala Clemente*, 567 F.2d at 1148; *Roberson*, 382 F.2d at 721; *cf. Indian Towing Co. v. United States*, 350 U.S. 61, 76 S.Ct. 122, 100 L.Ed. 48 (1955) (government may be liable where it gratuitously undertakes service upon which public justifiably relies).

 As HUD did not have an affirmative duty to ensure that Llorens Torres was designed and built safely, the plaintiffs could recover from the United States only if they could point to some act of intervention by HUD in the design or construction process that could meaningfully be said to have caused the balcony railing to be unsafe, thereby increasing the risk of harm to the Llorens Torres tenants. *See Zabala Clemente*, 567 F.2d at 1145. As it was CRUV that had ultimate responsibility for designing the project, it would not be enough to show that the allegedly unsafe railing was a remote consequence of CRUV's efforts to deal with HUD's objections to another feature of the original plans. HUD was entitled to request improvements in CRUV's design without assuming responsibility for all changes CRUV thereafter might make in response to its requests. Only if HUD, as distinct from CRUV, could be said to have been the proximate, rather than merely the incidental, cause of Nancy Ramos' injury, could the United States be held liable. *See* W. Prosser, Law of Torts §§ 31, 42 (4th ed. 1971).

Thus plaintiffs would have to prove that HUD either required the railings to be lowered or unreasonably insisted on some change that made the lowering of the railing unavoidable.

From the time they initiated their action the plaintiffs sought to obtain evidence that the United States had required the Ramos' balcony railing to be lowered from some greater height to 37.5 inches, but with scant success. The United States stated in sworn interrogatories that CRUV, not HUD, designed, approved and received the project, that HUD reserved the right to review and approve the plans "for the sole purpose of safeguarding the financial interest of the United States in the project," and that the official CRUV construction plans of the project called for 37.5 inch high railings. It filed a sworn statement of a civil engineer stating that he had measured eighteen balconies of nine apartments in Llorens Torres, including the plaintiffs' and balconies on the first and second floor of their building, and that the railings of these balconies were uniformly between 36 and 37.5 inches high. It also filed the deposition of Mr. Servaites, who testified that HUD's primary interest in Llorens Torres had been financial and the CRUV had designed the project.

The plaintiffs submitted no affidavits or evidence to contradict or supplement this information. Instead they attempted in their cross-examination of Mr. Servaites to create an issue of fact concerning his office's role in designing Llorens Torres. Servaites indicated that his office had devoted considerable attention to the details of the project and said that it had gone over CRUV's designs until they met federal requirements. He also said that there had been a Manual of Policy and Procedures covering site selection and methods for reviewing documents. HUD had had minimum standards for materials used and minimum living space requirements, and the local authority would have had to meet these, unless they had obtained a waiver. He replied affirmatively when asked whether HUD's monitoring of the program

was concerned with the "safety and the safety of the eventual occupants of the apartments," and added that, "you wouldn't deliberately go about building it defective so that it would be hazardous to health or good living."

Although he apparently could not recall any specific incidents, he stated that his office would have required revisions of the plans for Llorens Torres or the project itself at any stage, if it had, "encountered an oversight here or an error there. . . ." Asked whether he knew of any reason why the balcony railings on the upper floors in Llorens Torres might be lower than those on the lower floors, he replied that he did not. He recalled that the local authorities had been allowed to reduce the interior living area of the apartments because the outdoor porches were used as living space in the tropics. Plaintiffs' counsel read a letter[12] to him, stating that the interior area still did not meet the requirements for Puerto Rico and that the local authorities had agreed to widen the balcony and to raise a part of it adjacent to the kitchen to the level of the kitchen floor. Servaites could not recall the letter, but assumed, "that was probably the best judgment then of the reviewer who was going over the plans." He stated that his office typically met with the local authorities, "to iron out different views and different opinions and so forth. This was all part of our review of the plans and specifications."

Counsel for the plaintiffs had with him at the deposition some specifications which he did not identify clearly. Servaites surmised that these were HUD's standard specifications which were "canned" and "preprinted" and supplied with the bidding documents.[13] He said that, "wherever there was variation to satisfy local deviations they inserted them in the specifications . . ."

Counsel asserted that the specifications called for four-foot balcony railings on the lower floors and four-foot-one-and-a-half inch railings on the third floor. He then initiated the following, somewhat confusing exchange:

Q. Can you give any reason for approving such a specification [i. e., deviation][14]

A. I don't know of a single reason why that would have been the case. I know of no reason at any time where there should have been any deviation . . . in the height of the balconies.

Counsel then asked whether it was not possible that, when it was proposed to widen the balcony and to raise a part of the floor adjacent to the kitchen, "it was not cheaper for the contractor and for the designers to propose raising the whole balcony five inches or six inches whatever it was . . ." Mr. Servaites replied that he did not know the answer. Finally, asked whether there had been federal specifications for balcony heights, he responded, "I don't know that that was covered, frankly, I don't know. I am not that familiar with the specifications." He then said that, if there had been federal safety standards, HUD would have insisted that the local authority comply with them. At no point did he accept responsibility for the height of the balcony railings at Llorens Torres.

██ The plaintiffs would have us find that their cross-examination of Mr. Servaites created a "genuine issue" of material fact. See Fed.R.Civ.P. 56(c). It is clear that they would like to establish that HUD precipitated a change in the height of the balcony railings at Llorens Torres in order to accommodate a change in the balcony floor. They assert in their brief that HUD

---

12. This letter was never authenticated or filed with the court. A portion of it was quoted in an attachment to one of the plaintiffs' oppositions to the government's motion.

13. These specifications, like the letter referred to in footnote 12, were never authenticated or filed with the court. Nor was there any expert testimony as to what they required or any

indication that plaintiffs' counsel was qualified to interpret them.

14. It is not clear to us whether counsel was referring to the four foot versus four-foot-one-and-a-half inch deviation, or to the difference between these allegedly "standard" plans and the plans for Llorens Torres.

ordered the balcony floor raised and that, "There was no companion order to raise the parapet six inches." These allegations find no support in the record, however. Neither the letter nor the specifications that counsel made reference to in cross-examining Servaites were filed with the court; at best a portion of the purported letter was quoted in an appendix attached to one of the plaintiffs' memoranda in opposition to the government's motion. Moreover, even if these facts had been—or could be—established, plaintiffs would have to show more: as HUD was under no affirmative duty and as CRUV had ultimate responsibility for the design of the project, it would not be enough that HUD failed to act or suggested one change in the plans that, through a long chain of reactions, led CRUV to lower the balcony railings.

We agree with the government that it met its burden of showing that there was no factual issue as to HUD's role in designing Llorens Torres. That role was not such that HUD can be held legally responsible for the height of the Ramos' balcony railing. There is nothing in the record to support a finding of the facts that plaintiffs could have to show in order to recover. Once the self-serving speculation and innuendo of plaintiffs' counsel is eliminated, what remains are a number of statements by Mr. Servaites indicating that his office was in close contact with CRUV as the plans for the Llorens Torres project were drafted and that HUD's interests extended to features that would affect the sound construction of the project and the general health and safety of its tenants, such as the floor area of the apartments and the quality of the building materials. These few statements must be taken in conjunction with the undisputed fact that HUD's primary interest was in the financial viability of the project and that the project was designed by CRUV's own architects. The fact that Servaites' officer reviewed the plans in close cooperation with CRUV does not contradict this.

The government having submitted material sufficient to establish that it had not designed the Ramos' balcony, it was incumbent on the plaintiffs to show that a trial was necessary by filing counter-affidavits or other attested documents indicating the existence of a contrary fact material to the litigation. See Fed.R.Civ.P. 56(c); *Mack v. Cape Elizabeth School Board*, 553 F.2d 720, 722 (1st Cir. 1977); *Hahn v. Sargent*, 523 F.2d 461, 464 (1st Cir. 1975). As they failed to do so, summary judgment was proper.

The plaintiffs, anticipating this ruling, complained in their brief and at oral argument that they had evidence of HUD's negligence and that the lower court was aware of this. They argue that the court unfairly surprised them by ruling on the issue of negligence, which they say was not before it. As nearly as we can ascertain, they take the position that the letter and the specifications that plaintiffs' counsel referred to in his cross-examination of Mr. Servaites would have established HUD's complicity in designing the balcony, and that they should have had an opportunity to present this evidence to the court.

We reject the plaintiffs' assertions that the district court acted prematurely in disposing of the issue of the government's liability for its own negligence. Although the parties had not addressed the question whether, as a matter of law, the balcony was constructed negligently, they did know that the government's responsibility for the design of the balcony was disputed and was material to the issue of negligence. Indeed, in an Opposition dated July 28, 1977, the plaintiffs themselves framed the issue as whether "the United States, or any officer, agent or servant of the United States, [was] negligent, and if so, was that negligence the proximate cause of Nancy Ramos' injuries?"

█ Plaintiffs' failure to specify or submit whatever factual materials it had cannot be excused. Both parties were aware that the government's motion would be considered as a motion for summary judgment and that they were to submit to the court any materials appropriate to establish or contradict the existence of a genuine issue of fact. The court first indicated this in November 1976, discovery was ordered con-

tinued then and again in January 1977, the parties submitted what evidence is in the record, and the court did not act until February 1978. The plaintiffs had amply opportunity to submit their evidence and were required to do more than suggest that "something might turn up at trial," *Soar v. N.F.L. Players' Association*, 550 F.2d 1287, 1289 n. 4 (1st Cir. 1977).

*Affirmed.*